NICOLAS A. JAMPOL (State Bar No. 244867)
  nicolasjampol@dwt.com
CYDNEY SWOFFORD FREEMAN (State Bar No. 315766)
  cydneyfreeman@dwt.com
RACHEL R. GOLDBERG (State Bar No. 308852)
  rachelgoldberg@dwt.com
SAMANTHA LACHMAN (State Bar No. 331969)
  samanthalachman@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

Attorneys for Defendants
NATHANIEL PARKER, TINY GIANT
PRODUCTIONS, LLC, ASP FILM, LLC,
TM FILM FINANCE, LLC, AND
VERTICAL ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGING WORLD FILMS LLC, SELTON SHAW, and LANGSTON SHAW, <br><br>                       Plaintiffs, <br><br>     vs. <br><br> NATHANIEL PARKER *a/k/a* NATE PARKER, TM FILM FINANCE LLC *d/b/a* TM FILMS, TINY GIANT PRODUCTIONS, LLC *d/b/a* TINY GIANT ENTERTAINMENT, VERTICAL ENTERTAINMENT, LLC, SHELTON JACKSON LEE *a/k/a* SPIKE LEE, and ASP FILM, LLC, <br><br>                     Defendants. | Case No. 2:22-cv-09021-DSF-PLA <br><br> **DEFENDANTS NATHANIEL PARKER, TINY GIANT PRODUCTIONS, LLC, ASP FILM, LLC, TM FILM FINANCE, LLC, AND VERTICAL ENTERTAINMENT, LLC'S MOTION TO DISMISS** <br><br> Date:     March 27, 2023 <br> Time:    1:30 p.m. <br> Dept.:   Courtroom 7D |

**TO THE COURT, THE PARTIES, AND ALL COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 27, 2023, at 1:30 p.m. or as soon as may be heard in Courtroom 7D of the United States District Court for the Central District of California, 350 West 1st Street, Los Angeles, CA 90012, defendants Nathaniel Parker, Tiny Giant Productions, LLC, ASP Film, LLC, TM Film Finance, LLC, and Vertical Entertainment, LLC (collectively, the "Film Defendants") will and hereby do move this Court for an order dismissing the complaint filed by plaintiffs Changing World Films LLC, Selton Shaw, and Langston Shaw (collectively, "Plaintiffs").[1]

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the complaint fails to state a valid claim.  Plaintiffs' first cause of action for copyright infringement as to the film *American Skin* fails because the complaint neither plausibly alleges access to Plaintiffs' screenplay *A Routine Stop*, nor does it plausibly allege substantial similarity of protected expression between the works.  Because Plaintiffs' claim for copyright infringement fails, so too do their second and third claims for contributory and vicarious copyright infringement.

This motion is based on this notice of motion, the memorandum of points and authorities, the declaration of Rachel R. Goldberg, the notice of lodging with exhibit, and all other matters of which this Court may take judicial notice, the pleadings, files, and records in this action, and on any argument heard by this Court.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on January 17, 2023.

DATED: January 30, 2023

DAVIS WRIGHT TREMAINE LLP

By:  /s/ Rachel R. Goldberg
     Rachel R. Goldberg

Attorneys for Defendants

---

[1] The Film Defendants noticed March 27, 2023 as the hearing date pursuant to the agreed-upon briefing schedule.  *See* Dkt. 16.

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

i

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................... 1

II.   FACTUAL BACKGROUND.................................................... 2

    A.   The Plaintiffs and *A Routine Stop* ..................................... 2

    B.   The Film Defendants and *American Skin*.............................. 3

    C.   The TV One Screenplay Competition .................................... 5

    D.   The D.C. Lawsuit ............................................................ 5

    E.   The *Hardwell* Lawsuit ..................................................... 6

    F.   This Lawsuit ................................................................. 6

III.  PLAINTIFFS' DIRECT COPYRIGHT INFRINGEMENT CLAIM
     FAILS ............................................................................ 6

    A.   Plaintiffs Fail to Adequately Plead Access ........................... 7

        1.   Plaintiffs Do Not Allege the Script Was Widely
           Disseminated ......................................................... 7

        2.   Plaintiffs Fail To Allege A Particular Chain of Events
           Plausibly Linking Plaintiffs' Work to the Film Defendants ...... 8

    B.   Plaintiffs Fail to Adequately Plead Substantial Similarity................. 11

        1.   Substantial Similarity May Be Decided on a Motion to
           Dismiss ............................................................... 12

        2.   The Court Must Disregard Unprotectable Elements................ 13

        3.   The Works' Protected Expression Is Not Substantially
           Similar ................................................................ 16

           a.   Plot ............................................................ 16

           b.   Theme ......................................................... 19

           c.   Characters .................................................... 20

           d.   Plaintiffs Do Not Allege The Setting, Dialogue,
              Mood, Pace, or Sequence of Events Is Substantially
              Similar.................................................... 23

IV.   PLAINTIFFS' SECONDARY LIABILITY CLAIMS ALSO FAIL........... 25

V.    CONCLUSION................................................................ 25

ii

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdin v. CBS Broad. Inc.*,
    971 F.3d 57 (2d Cir. 2020)................................................................ 14

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994) ......................................................... 13

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
    581 F.3d 1138 (9th Cir. 2009) .........................................................7

*Benay v. Warner Bros. Ent.*,
    607 F.3d 620 (9th Cir. 2010) ........................................................ 14

*Benjamin v. Walt Disney Co.*,
    2007 WL 1655783 (C.D. Cal. June 5, 2007) ................................... 20

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985) ................................................. 13, 15

*Briggs v. Blomkamp*,
    70 F. Supp. 3d 1155 (N.D. Cal. 2014) .............................................8

*Cavalier v. Random House, Inc.*,
    297 F.3d 815 (9th Cir. 2002) ........................................................ 13

*Changing the World Films, LLC v. Parker*,
    No. 1:21-cv-02787-DLF (D.D.C. Oct. 20, 2021) ..............................5

*Christianson v. West Pub. Co.*,
    149 F.2d 202 (9th Cir. 1945) ........................................................ 12

*Corbello v. Valli*,
    974 F.3d 965 (9th Cir. 2020) ................................................... 14, 16

*Edwards v. Cinelou Films, LLC*,
    2016 WL 9686986 (C.D. Cal. June 22, 2016) ................................. 15

*Evans v. Warner Bros. Ent.*,
    2018 WL 6133660 (C.D. Cal. Sept. 17, 2018) ..................... 7, 8, 9, 11

iii

*Feist Publ'ns v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ...................................................................... 6, 14

*Fox Broad. Co. v. Dish Network L.L.C.*,
  747 F.3d 1060 (9th Cir. 2014) ............................................................ 25

*Funky Films v. Time Warner Ent.*,
  462 F.3d 1072 (9th Cir. 2006) ............................................................ 12

*Gallagher v. Lions Gate Ent. Inc.*,
  2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ............................... 24

*Griffin v. Peele*,
  2017 WL 8231241 (C.D. Cal. Oct. 18, 2017) ....................................... 9

*Hardwell v. Parker*,
  No. 2:21-cv-9100-DMG-PVC (C.D. Cal. Nov. 19, 2021) ............... 6, 15, 16, 17

*Klauber Bros., Inc. v. City Chic Collective Ltd.*,
  2022 WL 17184799 (C.D. Cal. Aug. 26, 2022) ................................. 10

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .............................................................. 3

*Kouf v. Walt Disney Pictures & Television*,
  16 F.3d 1042 (9th Cir. 1994) ............................................................. 16

*Marcus v. ABC Signature Studios, Inc.*,
  279 F. Supp. 3d 1056 (C.D. Cal. 2017) ............................................. 21

*Newt v. Twentieth Century Fox Film Corp.*,
  2016 WL 4059691 (C.D. Cal. July 27, 2016) ............................... 14, 24

*Olson v. Nat'l Broad. Co.*,
  855 F.2d 1446 (9th Cir. 1988) ............................................................ 24

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ....................................................... 11, 12

*Ricketts v. Berlanti Prods.*,
  2022 WL 1046252 (9th Cir. Apr. 7, 2022) ......................................... 13

*Ricketts v. CBS Corps.*,
  2020 WL 5005909 (C.D. Cal. July 23, 2020) ............................... 12, 13

iv

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Ricketts v. CBS Corps.*,
    439 F. Supp. 3d 1199 (C.D. Cal. 2020) .......................................... 12, 14, 20, 21

*Schkeiban v. Cameron*,
    2012 WL 12895721 (C.D. Cal. July 20, 2012)................................... 7, 8, 9

*Segal v. Segel*,
    2022 WL 198699 (S.D. Cal. Jan. 21, 2022)..........................................7

*Shame on You Prods., Inc. v. Banks*,
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) ..................................... 13, 20

*Silas v. Home Box Office, Inc.*,
    201 F. Supp. 3d 1158 (C.D. Cal. 2016) ..................................... 19, 20

*Star Fabrics, Inc. v. The Wet Seal, Inc.*,
    2014 WL 12591271 (C.D. Cal. Dec. 2, 2014) ........................... 10, 11

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ....................................................... 6, 7

*Whitehead v. Netflix, Inc.*,
    2022 WL 17342602 (N.D. Cal. Nov. 30, 2022) ................................ 12

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ............................................ 13

*Zindel v. Fox Searchlight Pictures, Inc.*,
    2020 WL 3412252 (9th Cir. 2020) ........................................... 12, 13

**Statutes**

17 U.S.C. § 102(b) ............................................................................... 13

**Rules**

Federal Rules of Civil Procedure
    12(b)(2) ..............................................................................................5
    12(b)(6) ..............................................................................................6

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs Changing World Films LLC, Selton Shaw, and Langston Shaw assert copyright infringement claims against a variety of defendants regarding the development, production, and distribution of the award-winning film *American Skin*.  But Plaintiffs' allegations of access and substantial similarity are woefully insufficient to state a valid copyright claim.

Plaintiffs' various theories of access are unsupported and speculative, and fail as a matter of law.  Plaintiffs allege neither widespread dissemination nor a plausible chain of events linking their screenplay, *A Routine Stop*, to defendant Nathaniel Parker, who wrote *American Skin*.  Indeed, the only factual allegation involving access is that Plaintiffs submitted their screenplay, *A Routine Stop*, to the 2017 TV One Screenplay Competition.  Compl. ¶ 76.  But Plaintiffs fail to allege – as they must – a particular chain of events, supported by factual allegations, linking that submitted screenplay to the Film Defendants.  Instead, Plaintiffs offer three alternative unsupported theories as to how Mr. Parker could have possibly obtained their screenplay.  *Id.* ¶ 81(a)-(c).  Courts regularly dismiss complaints where, as here, allegations of access consist entirely of conjecture.

Plaintiffs' allegations of substantial similarity also fail as a matter of law.  Plaintiffs attempt to claim ownership over an idea – namely, the portrayal of a Black man who takes matters into his own hands when the justice system fails to hold law enforcement accountable for the murder of a family member – which is unprotected by copyright law.  Courts routinely dismiss copyright infringement actions like this one, which rely on alleged similarities that consist of unprotectable ideas, *scenes a faire* that flow from those ideas, generic elements that are commonplace in film and television, and facts from news and culture.  *American Skin* and *A Routine Stop* certainly share unprotectable similarities, but they are significantly different in their *protectable* elements, which is all that matters under copyright law.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Because Plaintiffs fail to adequately allege access or substantial similarity, and this is Plaintiffs' third attempt at a viable pleading,[2] the Film Defendants respectfully request that this Court dismiss Plaintiffs' complaint, with prejudice, for failure to state a valid claim.

## II.    FACTUAL BACKGROUND

### A.    The Plaintiffs and *A Routine Stop*

Plaintiffs Selton and Langston Shaw are screenwriters who "write, produce, and direct films together through their entertainment company, Changing World Films LLC," which they own and operate.  Compl. ¶¶ 2, 7.  Plaintiffs allege that in 2017, they wrote a screenplay called *A Routine Stop*, "which focused on police violence against Black men and women and the country's systemic indifference to it."  *Id*. ¶ 2.  In *A Routine Stop*, twin brothers Romulus and Remus are driving home from a wedding when they are stopped by a white police officer, purportedly for failing to signal during a lane change.  Compl. Ex. A at 4, 20.  Officer Kyle Tully shoots and kills Romulus.  *Id.* at 8, 40.  After a grand jury decides not to indict Tully, Remus enlists friends to help kidnap Tully, the prosecutor who (purposefully) failed to obtain an indictment, and twelve hostages to act as a jury to conduct a fake trial that is broadcast live from an undisclosed recording studio.  *Id.* at 5-9, 11, 12-17, 54-57.  Tully's other misdeeds, including prior complaints of use of excessive force, a DUI, and an extramarital affair, are revealed during the fake trial.  *Id.* at 53-54, 66.  Tully tries to justify the shooting by claiming Romulus was "acting erratic" and "was a criminal with a rap sheet longer than a roll of toilet paper" (unlike Remus, who has no criminal record and is a college graduate).  *Id.* at 18, 24.

Tully's police colleagues track down the twins' mother after seeing her testify during the live broadcast and convince her to tell them the location of the trial.  *Id.* at 27, 45-46, 61.  Police storm the recording studio and reveal that the twelve jury

---

[2] Plaintiffs filed a complaint and amended complaint in the District Court for the District of Columbia, which was dismissed for lack of personal jurisdiction. *See* Section II.C.

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

members are ten mannequins and only two real hostages – Tully's own wife and son. *Id.* at 75-79.  Tully's wife is disgusted about the murder and her husband's affair; Tully's son, who once idolized his father, is devastated. *Id.* at 76-79.  An epilogue reveals that as a result of the "trial," some measure of justice is obtained: Tully is indicted and fired, the prosecutor is disbarred, and the cops decide not to file charges against Remus despite the fact that he kidnapped a police officer and his family. *Id.* at 82.  The screenplay concludes with a twist: the audience learns that the brothers swapped IDs in the car, and Tully killed Remus, not Romulus. Romulus receives a second chance, without his criminal record and with Remus's name. *Id.* at 83, 85.

**B.    The Film Defendants and *American Skin***

The Film Defendants wrote, produced, and distributed the film *American Skin*. *See* Compl. ¶¶ 11-14, 15, 50-51.  *American Skin* is presented largely as the documentary thesis of a group of graduate film students.  As revealed by officer bodycam footage, a former marine turned high school janitor, Lincoln, and his 14-year-old son, Kajani, are stopped by police while driving through an affluent neighborhood in Los Angeles, allegedly for speeding.  *See* Declaration of Rachel R. Goldberg Ex. 1 ("Ex. 1") at 1:03.[3]  Kajani, who studied constitutional rights at his private school (where his father is the janitor), insists on filming the interaction despite his father's pleas for him to put down the phone. *Id.* at 2:05.  Police escalate the situation by drawing their weapons and an officer named Randall shoots and kills the unarmed Kajani. *Id.* at 2:35.

A year later, around the time a grand jury is about to decide whether to indict Officer Randall, a student documentary team approaches Lincoln with an idea to document the decision. *Id.* at 2:55.  Lincoln reluctantly allows the film crew access

---

[3] The Film is incorporated into the complaint by reference. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  Concurrent with filing this motion, the Film Defendants are lodging a DVD copy of the Film with the Court and serving a copy on Plaintiffs. *See* Goldberg Decl. ¶ 2; Notice of Lodging.

to his family, and the documentarians capture the family's dismay as the grand jury fails to indict Officer Randall. *Id.* at 20:00. The film crew follows the subsequent uprising throughout the city, and police ask Kajani's mother to film a statement asking protestors to abandon the violence. *Id.* at 24:20.

Shortly after, Lincoln asks the film crew to give him a ride and forces them to assist him kidnap the police captain. *Id.* at 26:30. Lincoln and several other veterans take the captain to the police station and lock down the premises, taking everyone inside hostage. *Id.* at 29:00. Seeking justice where the system failed, Lincoln stages a trial charging Randall with Kajani's murder, setting himself as the prosecutor, one of the police officers as Randall's defense counsel, and civilians, inmates, and administrative officers as the jury. *Id.* at 39:50. Lincoln makes the student documentarians film and participate in the trial. *Id.* at 35:35.

After extended discussions among the civilians, inmates, officers, and veterans about racism, the police's role in a community, patriotism, classism, and education, the jury finds Randall guilty of murder after he admits Lincoln was not speeding and that Randall racially profiled Lincoln. *See id.* at 48:10, 51:35, 52:43, 54:30, 57:10, 1:11:53, 1:14:34. Lincoln raises his gun to Randall's head to carry out a sentence of death, but not before allowing Randall to call his wife and son, to whom Randall apologizes and admits that he made a mistake. *Id.* at 1:15:20. Lincoln pulls the trigger, but the gun was empty – revealing he never intended to kill Randall, only wanting justice, not vengeance, for his son. *Id.* at 1:17:20. Lincoln releases the hostages, and Randall asks Lincoln to leave the building by his side, "not as an enemy." *Id.* at 1:21:31. Despite Randall yelling that Lincoln is unarmed, a sniper shoots Lincoln in the head, and police step over his lifeless body without even a pause as they sweep the building. *Id.* at 1:22:39. *American Skin* concludes with (fictional) media clips explaining away the takeover by claiming that Lincoln was mentally unstable and connected to Islamic extremists, and quickly pivoting to an upbeat discussion of sports. *Id.* at 1:23:25.

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**C.      The TV One Screenplay Competition**

Plaintiffs allege they submitted *A Routine Stop* to the 2017 TV One Screenplay Competition (the "TV One Competition"), which is "administered and judged in partnership with the American Black Film Festival (ABFF)."  Compl. ¶¶ 3, 37, 76-77.  The screenplay was not selected as a competition finalist.  Compl. ¶ 42.  While Plaintiffs allege that Mr. Parker was "involved in events with the ABFF" in a prior year, Compl. ¶ 78, they do not allege that any of the Film Defendants participated in or were involved with the TV One Competition during the year Plaintiffs allegedly submitted their screenplay (or any other year).  Instead, Plaintiffs offer several alternate theories of access:

First, Plaintiffs allege one of the actors in *American Skin* played out certain scenes of certain screenplays during the TV One Competition, and thus he somehow obtained *A Routine Stop* and then "either provided or acted out the screenplay Plaintiffs submitted for *A Routine Stop* to Defendant Parker."  Compl. ¶¶ 79-80, 81(a).  Second, alternatively, Plaintiffs theorize that some other unidentified individual "connected with the 2017 TV One Screenplay Competition or the ABFF made the screenplay for *A Routine Stop* available to a named defendant."  Compl. ¶ 81(b).  Third, Plaintiffs allege that perhaps in the "intervening two years" between the TV One Competition and the release of *American Skin*, Mr. Parker obtained a copy of Plaintiffs' screenplay "through another channel."  Compl. ¶ 81(c).

**D.      The D.C. Lawsuit**

On October 20, 2021, Plaintiffs filed a complaint for direct, contributory, and vicarious copyright infringement in the United States District Court for the District of Columbia.  *Changing the World Films, LLC v. Parker*, No. 1:21-cv-02787-DLF (D.D.C. Oct. 20, 2021) (the "D.C. Lawsuit"), ECF No. 1.  On April 29, 2022, Plaintiffs filed a first amended complaint.  D.C. Lawsuit, ECF No. 29.  On May 27, 2022, the Film Defendants moved to dismiss Plaintiffs' first amended complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and for failure to state a

1  claim under Fed. R. Civ. P. 12(b)(6).  D.C. Lawsuit, ECF No. 41.  The court granted

2  the motion to dismiss on December 2, 2022, on the grounds that it lacked personal

3  jurisdiction over any defendant.  D.C. Lawsuit, ECF No. 48.  The court did not

4  address the Film Defendants' other bases for dismissal.  *Id.* at 1.

5       **E.**   **The *Hardwell* Lawsuit**

6       On November 19, 2021, an individual unrelated to the parties in this case,

7  Avan Hardwell, filed a copyright infringement action against the Film Defendants

8  relating to *American Skin*.  *See Hardwell v. Parker*, No. 2:21-cv-9100-DMG-PVC

9  (C.D. Cal. Nov. 19, 2021), ECF No. 1.  Like Plaintiffs, Mr. Hardwell alleges that his

10  screenplay, *First and Constitution*, tells the story of a Black man who, in a desperate

11  attempt to obtain justice, takes matters into his own hands by taking hostages and

12  putting the police on trial for wrongfully killing his teenage son during a traffic

13  stop.  *Id*. ¶¶ 11-12.  Also like Plaintiffs, Mr. Hardwell claims that *American Skin*

14  copied his screenplay, which Mr. Hardwell alleges he registered in September 2016,

15  a year before Plaintiffs allegedly wrote *A Routine Stop*.  *Id*. ¶¶ 11, 25-26.

16       **F.**    **This Lawsuit**

17       On December 13, 2022, Plaintiffs filed this lawsuit for direct, contributory,

18  and vicarious copyright infringement.  Dkt. 1.  The Film Defendants again move to

19  dismiss the complaint in its entirety for failure to state a claim.

20  **III. PLAINTIFFS' DIRECT COPYRIGHT INFRINGEMENT CLAIM FAILS**

21       To avoid dismissal on their direct copyright infringement claim, Plaintiffs

22  must adequately allege "ownership of a valid copyright" and "copying of

23  constituent elements of the work that are original."  *Feist Publ'ns v. Rural Tel. Serv.*

24  *Co.*, 499 U.S. 340, 361 (1991).  Without direct evidence of copying, as here, a

25  plaintiff may establish copying by showing *both* (1) "that the defendant had 'access'

26  to the plaintiff's work" and (2) "that the two works are 'substantially similar.'"

27  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000).  Plaintiffs

28  have failed to show either access or substantial similarity.

### A.   Plaintiffs Fail to Adequately Plead Access

"To satisfy its burden of pleading access, plaintiff must allege facts from which a reasonable finder of fact could infer that the defendant had a reasonable opportunity to copy his or her work." *Evans v. Warner Bros. Ent.*, 2018 WL 6133660, at *2 (C.D. Cal. Sept. 17, 2018) (dismissing complaint for failure to adequately plead access). Even at the motion to dismiss stage, access "may not be inferred through mere speculation or conjecture." *Schkeiban v. Cameron*, 2012 WL 12895721, at *1-2 (C.D. Cal. July 20, 2012) (dismissing complaint where plaintiff "pleads no facts" and "merely speculates" regarding access). Instead, a plaintiff must show a "reasonable possibility" of access, which requires more than "a bare possibility." *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (finding that plaintiff did not plead more than a "bare possibility" of access). Importantly, "conjecture is insufficient." *Evans*, 2018 WL 6133660, at *2 (quoting *Three Boys*, 212 F.3d at 482).

Where, as here, there is no evidence of direct access, a plaintiff may establish access either by establishing that plaintiff's work was "widely disseminated" or a "particular chain of events" from the plaintiff's work to the creators of the allegedly infringing work. *Three Boys*, 212 F.3d at 482.

### 1.   Plaintiffs Do Not Allege the Script Was Widely Disseminated

"Allegations that support a finding of access through wide dissemination are those that enable a court to infer plausibly that the alleged protected works reached an audience sufficiently large and diverse to render reasonable the possibility [that] the alleged infringer himself is among that audience." *Segal v. Segel*, 2022 WL 198699, at *9 (S.D. Cal. Jan. 21, 2022) (finding complaint inadequately pled widespread dissemination). "[A]lthough the Ninth Circuit has not identified a specific threshold for the level of public engagement with a work that constitutes 'wide dissemination,' its precedent indicates that a work's degree of commercial success and/or notoriety must be substantial." *Id.*

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Here, Plaintiffs make no allegation that *A Routine Stop* was "widely disseminated." The only allegation that could conceivably be considered an allegation of widespread dissemination is that *A Routine Stop* was submitted to the TV One Competition (but was not selected as a finalist). Compl. ¶¶ 3, 37, 42, 76. While Plaintiffs reference the reach of the TV One cable channel (Compl. ¶¶ 3, 39), Plaintiffs make no allegations about the reach of the TV One Competition, let alone the reach of their script, which is the relevant consideration in assessing widespread dissemination. Plaintiffs' allegations, based on the entry of the screenplay into a single competition in which it was not selected as a finalist, without any allegations about the size of the competition's audience, are insufficient to establish widespread dissemination as a matter of law. *See, e.g.*, *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1167 (N.D. Cal. 2014) (entering screenplay in screenwriting competitions and posting drafts online did not constitute evidence of widespread dissemination), *aff'd sub nom. Briggs v. Sony Pictures Ent., Inc.*, 714 F. App'x 712 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 233 (2018).

> **2.      Plaintiffs Fail To Allege A Particular Chain of Events Plausibly Linking Plaintiffs' Work to the Film Defendants**

Plaintiffs also fail to allege a "particular chain of events" from *A Routine Stop* to Mr. Parker, who "wrote, directed, and starred in *American Skin*." Compl. ¶ 11. Instead, Plaintiffs speculate about various alternative theories of access, none of which are supported by factual allegations, and which are woefully insufficient to state a cause of action for copyright infringement.

It is black-letter law that speculation and conjecture about access are insufficient to state a claim. *Evans*, 2018 WL 6133660, at *2; *Schkeiban*, 2012 WL 12895721, at *1-2. In *Evans*, for example, after accessing allegations of access remarkably similar to those here, this Court granted the defendants' motion to dismiss, finding the plaintiff failed to plead sufficient facts that the television show "Stalker" infringed on her book. 2018 WL 6133660, at *1. In that case, the

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1   plaintiff attempted to establish access to her book by claiming that after she

2   promoted her book at a film festival to actors and "[t]hrough these actors, the Book

3   eventually ended up in the hands of producer Kevin Williamson." *Id.* at *3.  The

4   plaintiff failed to identify the actors to whom she gave the book and their

5   relationship, if any, with Williamson.  *Id.*  This court rejected the allegations linking

6   the plaintiff's book to the television show as "conjecture" and found that the

7   plaintiff had "not crossed the line between possibility and plausibility."  *Id.*

8          Similarly, in *Schkeiban*, 2012 WL 12895721, at *1, the plaintiff alleged he

9   gave his work to a third party expressly to give to the defendant, and that the third

10  party "indicated to [plaintiff] that he had given a copy of the work to [defendant]."

11  Still, the court found that the plaintiff pled "no facts showing a chain of events

12  from" the third party to the defendant and further provided "no evidence showing

13  whether their relationship is sufficiently strong to raise a reasonable possibility of

14  access."  *Id.* at *2.  Instead, the court held that the plaintiff was "merely

15  speculat[ing] without factual support," and dismissed the complaint for failing to

16  adequately plead access.  *Id.* at *1-2.

17         While access can be shown through a third-party intermediary, "the dealings

18  between the plaintiff and the intermediary and between the intermediary and the

19  alleged copier must involve some overlap in subject matter to permit an inference of

20  access."  *Griffin v. Peele*, 2017 WL 8231241, at *6 (C.D. Cal. Oct. 18, 2017).  In

21  *Griffin*, the plaintiff alleged that her book manuscript was given to specific

22  individuals who then shared it with the defendant.  *Id.*  The court found the

23  plaintiff's theory of pass-the-potato was no more than speculation and insufficient to

24  state a claim.  *Id.* at *5-6.

25         Here, Plaintiffs' only factual allegation about access is that they submitted *A*

26  *Routine Stop* to the TV One Competition, but it was not selected as a finalist.

27  Compl. ¶¶ 76-77.  Plaintiffs then offer three completely unsupported alternate

28  theories of access.  Compl. ¶ 81(a)-(c).  First, Plaintiffs allege that the TV One

9

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Competition "had actors play out scenes from several entries" and that Omari Hardwick, an actor in *American Skin*, "was one of the actors who played out scenes from entries."  Compl. ¶ 79-80.  Plaintiffs do *not* allege that *A Routine Stop* was one of the entries that Mr. Hardwick acted out, nor do they allege that Mr. Hardwick otherwise read *A Routine Stop*, nor do they explain why he would have read out or even had possession of the entire script as opposed to certain "scenes," nor do they explain how or why Mr. Hardwick, who was later hired to act in *American Skin,* provided Mr. Parker with their screenplay from the TV One Competition.  Plaintiffs only speculate that Mr. Hardwick "was involved in the 2017 TV One Screenplay Competition and either provided or acted out the screenplay Plaintiffs submitted for *A Routine Stop* to Defendant Parker."  Compl. ¶ 81(c).  This is nothing more than guesswork and does not plausibly allege access.

Plaintiffs' other two theories of access are even worse.  Their second theory is that some unidentified individual, with some connection to the TV One Competition, "made the screenplay for *A Routine Stop* available to a named defendant or Mr. Hardwick."  Compl. ¶ 81(b).  The third theory is that Mr. Parker "obtained a copy of Plaintiffs' screenplay through another channel," without any specific information about that alleged channel.  Compl. ¶ 81(c).  These are bare-bones allegations devoid of any factual allegations whatsoever and cannot support a finding of access.

Importantly, courts routinely dismiss claims for copyright infringement where, as here, the allegation of access are based on a "speculative list" of theories.  *E.g.*, *Klauber Bros., Inc. v. City Chic Collective Ltd.*, 2022 WL 17184799, at *5 (C.D. Cal. Aug. 26, 2022) ("But these allegations amount to no more than 'a speculative list of the potential ways [Defendant *could have* theoretically accessed' the [works].") (emphasis added).  In *Star Fabrics, Inc. v. The Wet Seal, Inc.*, 2014 WL 12591271 (C.D. Cal. Dec. 2, 2014), for example, the plaintiff provided a "speculative list of the potential ways [the defendant] could have theoretically

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

accessed Star's design." *Id.* at *4.  Despite the multiple theories of potential access, the court explained "the Complaint fails to allege any *concrete facts* specifically linking [the defendant] to the protected design" and found the plaintiff had "not adequately alleged access by a chain of events." *Id.* (emphasis added).

Similarly, here, Plaintiffs fail to allege any concrete facts linking *A Routine Stop* to any of the Film Defendants.  Indeed, Plaintiffs fail to plead *any* facts in support of their theories, each alleged in the alternative (because Plaintiffs have no factual support for any of them).  Even *within* the alternative theories, there are *further* alternatives.  *See, e.g.,* Compl. ¶ 81(a) (as part of their first theory of access, alleging that Mr. Hardwick "*either* provided *or* acted out" Plaintiffs' screenplay to Mr. Parker) (emphases added).  As in *Evans*, Plaintiffs fail to plead any factual allegations about who may have provided their screenplay to a defendant or how they did so.  *See* 2018 WL 6133660, at *3.  Instead, Plaintiffs allege that an actor might, at some point, have read out some scenes of their screenplay (which was not a finalist) or perhaps the actor was provided the screenplay and gave it to Mr. Parker, or perhaps he acted it out for Mr. Parker, or perhaps some other unidentified person connected to the TV One Competition or the ABFF somehow and for some reason provided Plaintiffs' screenplay to Mr. Parker, or perhaps Mr. Parker obtained the screenplay through "another channel" entirely.  Plaintiffs' unsupported theories about the ways in which it would be theoretically possible for the Film Defendants to access Plaintiffs' screenplay are insufficient as a matter of law.

Because Plaintiffs fail to adequately allege access, their claims fail whether or not the works are substantially similar.

### B.      Plaintiffs Fail to Adequately Plead Substantial Similarity

In addition to access, to establish a plausible claim for copyright infringement, Plaintiffs must also show that the works at issue are "substantially similar."  *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1.     **Substantial Similarity May Be Decided on a Motion to Dismiss**

The Ninth Circuit has published two decisions on appeals from dismissals of copyright claims: *Christianson v. West Pub. Co.*, 149 F.2d 202 (9th Cir. 1945) and *Rentmeester*, 883 F.3d 1111.  In *both* of these cases, the court affirmed the district court's dismissal of the action for lack of substantial similarity.  As the Ninth Circuit explained in *Christianson*, "when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."  149 F.2d at 203.  Thus, as both of the works at issue are before the Court, substantial similarity may be decided on a motion to dismiss.[4]

District courts in this circuit routinely dismiss claims for lack of substantial similarity.  Just recently, in *Whitehead v. Netflix, Inc.*, 2022 WL 17342602, at *10 (N.D. Cal. Nov. 30, 2022), the district court dismissed plaintiff's copyright infringement claim based on lack of substantial similarity, and confirmed that *Christianson* "is still good law," explaining that "[i]n the years since *Christianson*, the Ninth Circuit has regularly affirmed dismissals of copyright infringement claims when a comparison of the works—whether attached to a complaint or incorporated by reference—shows that they are not substantially similar as a matter of law."  *Id.*

Similarly, in *Ricketts v. CBS Corps.*, 439 F. Supp. 3d 1199, 1212 (C.D. Cal. 2020), this Court found no substantial similarity and granted defendants' motion for judgment on the pleadings.  This Court explained "Plaintiff does not, and cannot, assert that the Court is without power or authority to determine substantial similarity as a matter of law."  *Id.* at 1211.  The plaintiffs then moved to vacate this Court's decision, arguing "the Ninth Circuit's unpublished decision in *Zindel*, 2020 WL 3412252, constitutes a sufficient change of law to warrant reconsideration."

---

[4] Moreover, the Ninth Circuit requires courts to examine the works themselves independently, and not simply rely on parties' characterizations of alleged similarities.  *See, e.g., Funky Films v. Time Warner Ent.*, 462 F.3d 1072 at 1077-1078 (9th Cir. 2006) (reaching its holding based on "an actual reading of the two works" instead of plaintiff's mischaracterizations).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Ricketts v. CBS Corps.*, 2020 WL 5005909, at *3 (C.D. Cal. July 23, 2020).  This

Court disagreed: "Nothing in *Zindel* constitutes a change in law.  Not only

is *Zindel* not controlling because it is unpublished but, the Ninth Circuit held only

that, in that case, the district erred in finding that the works were substantially

similar at the motion to dismiss stage.  Therefore, *Zindel* does not warrant

reconsideration of the JOP Order."  *Id.*  The plaintiff appealed and the Ninth Circuit

affirmed.  *See Ricketts v. Berlanti Prods.*, 2022 WL 1046252 (9th Cir. Apr. 7,

2022).  The Ninth Circuit held that "[t]he district court properly dismissed

Ricketts's copyright infringement claim because Ricketts's copyrighted work at the

time of the district court's order and the first two episodes of the defendants'

television show, 'All American,' including its promotional trailers, are not

substantially similar under the extrinsic test, and any similarities in the general

concepts are unprotected."  *Id.* at *1.

### 2. The Court Must Disregard Unprotectable Elements

To assess substantial similarity on a motion to dismiss, the Ninth Circuit uses

the "extrinsic test," which focuses on the works' objective "articulable similarities."

*Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133 (C.D. Cal. 2007).  Before

assessing similarity, "a court must filter out and disregard the non-protectible

elements."  *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

Indeed, courts "may place '*no* reliance upon any similarity in expression resulting

from' unprotectable elements."  *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d

1435, 1446 (9th Cir. 1994).

In particular, "the general idea for a story" and "all situations and incidents

which flow naturally from a basic plot premise," also known as *scenes a faire*, must

be filtered out prior to the substantial similarity assessment.  *Berkic v. Crichton*, 761

F.2d 1289, 1293 (9th Cir. 1985).  *See also* 17 U.S.C. § 102(b) (ideas are not

copyrightable).  In *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1151

(C.D. Cal. 2015), *aff'd*, 690 F. App'x 519 (9th Cir. 2017), for example, the Ninth

13
FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001
DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Circuit affirmed a dismissal for lack of substantial similarity after disregarding similarities flowing from the works' shared premise, such as "[g]etting drunk, spending a 'one-nighter' with someone you just met, waking up disoriented the next morning at the individual's house or apartment, and putting on the clothes worn the night before."  And in *Benay v. Warner Bros. Ent.*, 607 F.3d 620, 625 (9th Cir. 2010), the Ninth Circuit disregarded numerous similarities that flowed from the works' shared "basic plot premise" of "an American war veteran [who] travels to Japan in the 1870s to train the Imperial Army in modern Western warfare," including, for example, the protagonist "introduc[ing] modern warfare to the Imperial Army" and scenes of the protagonist sailing into Japan.

*Ricketts* is informative on this point.  In that case, this Court found no substantial similarity where both plots involved "a talented African-American football player from the 'hood' who eventually plays football for a school in a 'more privileged' area," both works begin with a shooting, both feature racism from a white player playing the same football position.  439 F. Supp. 3d at 1212.  The Court filtered out these unprotectable ideas and *scenes a faire*, before conducting the extrinsic analysis and dismissing the complaint.  Similarly, in *Newt v. Twentieth Century Fox Film Corp.*, 2016 WL 4059691, at *3 (C.D. Cal. July 27, 2016) the court agreed with plaintiff that the works "each follow an African American man who was involved in drug dealing and has sons pursuing a music career."  Still, the court looked past these general ideas and found plaintiff's "works and *Empire* are not substantially similar as to plot."  *Id.*  The court granted the motion to dismiss for lack of substantial similarity as a matter of law.  *Id.* at *12.

Apart from unprotectable ideas and *scenes a faire*, "all facts—scientific, historical, biographical, and news of the day . . . 'may not be copyrighted and are part of the public domain available to every person.'"  *Feist Publ'ns,* 499 U.S. at 348.  *See also Corbello v. Valli*, 974 F.3d 965, 976 (9th Cir. 2020) (filtering out "unprotectable historical facts" and rejecting author's claims against musical *Jersey*

*Boys*), *cert. denied*, 141 S. Ct. 2856 (2021); *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 67 (2d Cir. 2020) (setting aside allegations of similar tardigrade characters that shared factual characteristics with actual tardigrade microorganisms, including the capability to survive in outer space without protection, "eight short legs that run in pairs along a rounded body," and "an O-shaped mouth in the center of the face" as factual and unprotectable, affirming dismissal on substantial similarity grounds) (internal quotation marks omitted).

Lastly, courts also filter out generic or common elements before analyzing for substantial similarity.  In *Berkic*, 761 F.2d at 1294, for example, after filtering out *scenes a faire*, this Court found that "other similarities," including "depictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young people on one hand, and conservative or evil bureaucracies on the other," were "among the very staples of modern American literature and film" and thus unprotectable.  *See also Edwards v. Cinelou Films, LLC*, 2016 WL 9686986, at *2, *4 (C.D. Cal. June 22, 2016) (unprotectable "commonly-used artistic devices" included, for example, "scenes of a person reading a book and then looking up from the book toward the camera," scenes shot in an alleyway or in the rain "for dramatic effect," or "scenes of a person staring out of a window"), *aff'd*, 696 F. App'x 270 (9th Cir. 2017).

Here, while Plaintiffs alleges various similarities between the works, a review of the works themselves reveals that the alleged similarities are unprotectable ideas, *scenes a faire*, generic elements, or facts ripped from the headlines, not to mention the many exaggerations or mischaracterizations of the alleged similarities.  Indeed, this is exactly why the Film Defendants were also sued by a *different* plaintiff, claiming that the Film Defendants actually copied *his* screenplay, also about a Black man whose son is killed by police during a traffic stop and decides to take justice into his own hands by taking hostages and conducting a trial for the officer who killed his son.  *See Hardwell v. Parker*, No. 2:21-cv-9100-DMG-PVC (C.D. Cal.

Nov. 19, 2021).  Notably, the plaintiff in that case made almost identical allegations of substantial similarity as Plaintiffs do in this case, which underscores how Plaintiffs' alleged similarities are unprotectable, and likely present in more works by other screenwriters.  Even more notably, the *Hardwell* plaintiff's screenplay predates Plaintiffs' screenplay in this case, meaning that even if those elements *were* protectable, which they are not, they would not belong to Plaintiffs in any event.

### 3.     The Works' Protected Expression Is Not Substantially Similar

Once unprotectable elements are filtered out, courts must then compare the objective, "specific expressive elements" of the works at issue: "'the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.'"  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  After filtering out the unprotectable similarities, *A Routine Stop* and *American Skin* are not substantially similar in their protected elements.

### a.     Plot

Most of the alleged similarities between the works' plots are unprotectable concepts, *scenes a faire*, and generic elements in film and television.

*First*, the idea of a police officer killing an unarmed Black man during a traffic stop, and then facing no criminal repercussion, is sadly based in reality.  *See* Compl. ¶¶ 5, 59.  This premise, based in fact, is unprotectable.  *Corbello*, 974 F.3d at 975.

*Second*, it follows naturally that a man who watched an officer walk away from killing a loved one without consequence would "feel[] betrayed by the justice system," and might "decide[] to take matters into his own hands."  Compl. ¶¶ 60, 70.  This idea of vigilante justice is not original, instead found in countless works.[5]

---

[5] For example, the 2009 film *Law Abiding Citizen*, in which "[a] frustrated man decides to take justice into his own hands after a plea bargain sets one of his family's killers free," and the 2009 film *Harry Brown*, in which "[a]n elderly ex-serviceman and widower looks to avenge his best friend's murder by doling out his own form of justice".  *See Law Abiding Citizen* (2009), https://www.imdb.com/title/tt1197624/; *Harry Brown* (2009), https://www.imdb.com/title/tt1289406/.

And it flows naturally that such vigilante justice might include a "trial" after the legal system fails to subject the wrongdoer to an actual criminal trial. Compl. ¶¶ 60, 62. Indeed, the *Hardwell* complaint alleges this same exact premise. *See infra* at Section II.E. Plaintiffs' complaint summarizes this unprotectable idea, rooted in the creators' desire to probe the justice system's treatment of systemic racism: "an ordinary man, feeling betrayed by the system that is supposed to protect him and his loved ones, takes it upon himself to right the wrong committed on his [loved one] by exposing the failure of the system itself." *Id.* ¶ 46. This is an unprotectable "basic plot premise," which flows naturally from the unprotectable idea of a police officer escaping criminal charges for killing an unarmed man during a traffic stop.

Other alleged similarities flow from these ideas. It makes sense that the cleared officer would not willingly submit to an unauthorized trial and would "express[] that the main character has no authority to charge him." Compl. ¶ 65. Given that the officer was kidnapped and held hostage, it is unsurprising that the kidnapper would be "armed with a handgun." *Id.* ¶ 66. Given the unprotectable premise of the "trial," it makes sense that the character most devastated by the cop's actions would present the prosecution's case. *Id.* ¶ 63.

And it flows naturally that the cop's guilty sentence would satisfy the main character's need for justice – not revenge – such that he would choose not to kill the cop after the trial. *Id.* ¶¶ 68-69. If revenge were the character's goal, he would not go through the effort of a "trial," and instead would simply exact his revenge. And while it may be true that in *A Routine Stop*, "at the last minute the main character decides not to kill the white police officer," in *American Skin*, Lincoln did not have bullets in his gun the entire time, indicating he *never* had any intention of killing the officer. *Compare* Compl. ¶ 69 *with* Ex. 1 at 1:17:15.

Once these unprotectable premises and elements are disregarded, the plots of the works are quite different. For example:

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

- In *A Routine Stop*, twin brothers in their twenties are stopped coming home from a wedding, and an officer kills one, claiming he thought the unarmed man was pulling out a gun. Compl. Ex. A at 4, 40, 65. In contrast, in *American Skin*, a father and his 14-year-old son are stopped in an affluent neighborhood; the son is shot after refusing to stop recording the incident with his cell phone. Ex. 1 at 2:10.

- In *A Routine Stop*, the kidnapping and trial involves a small group of people: three operatives, a couple witnesses, two jury members (the officer's family, who do not deliberate), and the officer himself. Romulus's friends act as the judge and the bailiff. Officer Tully is forced to act as his own defense counsel. There is no discussion of societal issues. Compl. Ex. A at 5-9, 14-17, 23-26, 64-70, 76. In contrast, in *American Skin*, Lincoln handles the kidnapping himself and forces the documentary students to become unwilling participants. The trial is a huge operation conducted through a complete takeover of a police precinct by Lincoln and many veteran operatives. There is no judge. Lincoln appoints another officer to act as Officer Randall's defense counsel, and police officers, civilians, inmates, and the student documentary crew all are forced to participate and debate the merits of the officer's case – as well as critical societal issues including race, classism, patriotism, slavery, and the proper role of police in our country. Ex. 1 at 43:05.

- In *A Routine Stop*, Romulus broadcasts the trial live to the police station from a recording studio, setting off the major plot line of Tully's fellow cops searching all possible ways to find the studio and end the trial. Tully is rescued after Romulus's mother eventually tells the cops the studio's location. Compl. Ex. A at 61, 63, 75. In contrast, the officers in *American Skin* are not looking for Randall – they know precisely where he is as they are with him at the precinct.

- In *A Routine Stop*, Officer Tully never appears remorseful for his actions. But some measure of justice is nevertheless achieved: Tully is fired and indicted for murder and the prosecutor who coached his grand jury testimony is disbarred and indicted. Compl. Ex. A at 79, 82. In addition, the audience learns that Remus was

murdered instead of Romulus, leaving Romulus to lead a new life under Remus's name, free from his criminal record.  *Id.* at 83, 85.  In contrast, in *American Skin*, Officer Randall ultimately appears genuinely remorseful for his actions, apologizing and attempting to help Lincoln leave the precinct unharmed.  Ex. 1 at 1:21:12.  But Lincoln is shot by a sniper and the cop is never formally charged – even at the end, there is no justice.  *Id.* at 1:22:38.

### b. Theme

"A work's theme is its overarching message," and "there is no protection for stock themes or themes that flow necessarily from a basic premise."  *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626 (9th Cir. 2018).  Plaintiffs emphasize that both works "focus[] on police violence against Black men and women and the country's systemic indifference to it."  Compl. ¶¶ 2 (*A Routine Stop*), 4 (*American Skin*).  As described above, this theme is based in reality and unprotectable.

Moreover, this theme is explored differently in each work.  In *A Routine Stop*, justice is delivered, as the officer who killed Remus is fired and indicted for murder, the prosecutor is disbarred and indicted, and, amazingly, no criminal charges are brought against Romulus for kidnapping a police officer, a prosecutor, and two innocent victims.  Compl. Ex. A at 79, 81-82.  The screenplay ends with hope and optimism, as Romulus is given a second chance with an erased criminal record.  By stark contrast, there is no justice in *American Skin*: Lincoln is killed by a sniper in retaliation for the precinct takeover and his lifeless body is treated like debris.  Ex. 1 at 1:23:24.  The film closes with the 24-hour news cycle pivoting from explaining away a Black military veteran and father's plea for justice as mental instability and caused by fabricated "connections to Islamic extremists" to an upbeat discussion of sports, the world having learned no lessons.  *Id.* at 1:23:44.

In addition, the complaint fails to mention *American Skin*'s central theme of a father-son relationship and the sacrifices a father will make to protect his son, as

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Lincoln first abandons his career to prioritize his son's education and ultimately gives his life to seek justice for his son. *See* Ex. 1 at 7:00, 15:30, 1:22:36. The film further explores the difficult transition veterans make when rejoining civilian life after their military discharge. *See* Ex. 1 at 6:42, 15:24, 17:25. *A Routine Stop* does not explore these themes.

### c.      Characters

"In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in the plaintiff's work." *Shame on You Prods.*, 120 F. Supp. 3d at 1164 (internal brackets omitted). As part of this analysis, courts analyze characters' "noticeable" (*Silas*, 201 F. Supp. 3d at 1177) or "material" (*Benjamin v. Walt Disney Co.*, 2007 WL 1655783, at *6 (C.D. Cal. June 5, 2007)) differences.

Plaintiffs allege superficial similarities between a handful of characters across the dozens of characters in each work. To start, Plaintiffs allege that the main characters in *A Routine Stop* (Romulus) and *American Skin* (Lincoln) are described as "as unshaven, intelligent, African American men, who have strong viewpoints on justice" and who feel "helpless and betrayed by the criminal justice system." Compl. ¶ 70. But these shared general traits do not make the two characters similar for purposes of copyright. *See Ricketts*, 439 F. Supp. 3d at 1215-16 (finding characters were not substantially similar though "protagonists of the two works are similar at the abstract level – they are both young, African-American men who are from disadvantaged neighborhoods and play football . . . [and] both characters wear the number 11 . . . [and] both players have a similar build, size and shape").

Beyond the generic similarities, Romulus and Lincoln are quite different. Romulus is a single man in his late twenties who the officer describes as "a criminal with a rap sheet longer than a roll of toilet tissue." Compl. Ex. A at 24. Lincoln is a military veteran who, upon discharge, took a job as a janitor in a wealthy private

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

school so that his teenage son could attend the elite school.  Ex. 1 at 7:00, 15:30.
Romulus is a young man just starting his life after making bad choices in his past;
Lincoln has chosen to sacrifice his career to ensure his son's future – a future stolen
from them both by Officer Randall.

Reviewing the actual works at issue further dispels Plaintiffs' allegations of
similarities between the works' characters:

- The complaint ignores the significant differences between the police officers
in each of the works.  In *A Routine Stop*, even after going through the trial and
seeing the damage caused by Remus's death, Officer Tully does not express
remorse.  By the end of the screenplay, however, Tully is indicted for second degree
murder and obstruction of justice and is fired.  *Id.* at 79, 82.  In *American Skin*, on
the other hand, Officer Randall listens to the impact his actions had on Lincoln and
considers the larger implication of racial profiling.  Randall apologizes for his
actions and ultimately tries to protect Lincoln's life.  Ex. 1 at 1:21:26.

- The complaint also alleges that the shooting officer in each work has "a wife
and a young son."  Compl. ¶ 64.  Even if accurate, the similarity is at best the same
type of "general character trait" that is unprotectable under copyright law.  *See
Ricketts*, 439 F. Supp. 3d at 1215-17; *Marcus v. ABC Signature Studios, Inc.*, 279 F.
Supp. 3d 1056, 1068-70 (C.D. Cal. 2017).  Furthermore, Randall, the officer in
*American Skin*, is depicted as a loving father and husband.  Officer Tully, in
contrast, cheats on his wife and devastates his son.  Compl. Ex. A at 77-78.  The
complaint further alleges that both officers attempt to justify the shooting in part by
explaining they were "just trying to make it home," but this is a natural response of
a police officer accused of killing someone in the line of duty.  Compl. ¶ 67.

- The complaint alleges that a "police captain" in each work "tries to end the
standoff and trial without violence."  FAC ¶ 71.  While a police captain attempting
to end a hostage situation without violence is hardly novel or protectable, the
characters and scenes unfold differently in each work: in *A Routine Stop*, the police

captain spends nearly the entire screenplay searching for Romulus's location to end the standoff, ultimately resolving the situation without violence, never bringing charges against Romulus for kidnapping and instead holding Officer Tully and the district attorney accountable for their actions (Compl. Ex. A at 12, 19, 37, 45, 79, 81-82); in *American Skin*, the captain himself is a hostage, is kidnapped personally by Lincoln, participates in the trial, and does not stop the SWAT team from shooting Lincoln in the end (Ex. 1 at 27:26, 29:35, 1:22:36).

- The complaint alleges that "the mother of the deceased victim is a supporting character" in both works. Compl. ¶ 72. Of course she is. But the mothers take on different roles in each work. In *A Routine Stop*, Remus's mid-60s mother testifies as a character witness in Romulus's staged trial, and ultimately reveals the trial's location to police and pleas with the sergeant not to "let them kill [her] baby." Compl. Ex. A at 27, 63. In *American Skin*, while Kajani's mother copes with her devastation over her son's death and the lack of grand jury indictment, officers ask her to give a public statement admonishing protesters to stop the violence. Ex. 1 at 24:20. Kajani's mother takes no part in the kidnapping or Lincoln's trial.

- Plaintiffs' allegation that two characters' names – Carter "Duck" Duckworth and Omar "Derwood" Scott, Compl. ¶ 73 – are similar is puzzling. "Duck" and "Derwood" are not similar names other than beginning with the same letter. Plaintiffs further claim these characters are similar because they are "portrayed as rough and with nothing to lose." *Id.* It is no surprise that a man willing to help take police hostage would be "portrayed as rough and with nothing to lose" (*id.*), and moreover, those characteristics are too generic to be protectable. But even that characterization is a stretch. While Duck, in *A Routine Stop*, may be "portrayed as rough," he is *not* portrayed as having nothing to lose – on the contrary, Duck is committed to the kidnapping in spite of the consequences because of his bond to Remus. *See* Compl. Ex. A at 5-6. On the other hand, Lincoln's friend Derwood in *American Skin* is dying of cancer; he truly has "nothing to lose." Ex. 1 at 17:30.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

- Plaintiffs allege that both works include "a prosecutor who does not indict the police officer who was charged." Compl. ¶ 74. A prosecutor's failure to fully prosecute police flows naturally from the works' unprotected premise of a man disheartened with the criminal justice system's response to injustice. Moreover, the prosecutor in *A Routine Stop* is a fully formed character, appearing as a witness in the trial and ultimately disbarred and indicted for obstruction of justice and witness tampering. Compl. Ex. A at 51, 81. There is no equivalent character in *American Skin* and there are no allegations of prosecutorial misconduct in the film.

In addition to overstating the similarities between certain characters, Plaintiffs ignore meaningful differences between other characters in the works. For example, in *A Routine Stop*, we know little about Remus other than that he was a loving son and brother, an upstanding adult, and that he was flirtatious. Compl. Ex. A at 1-2, 18, 30, 45. In contrast, *American Skin* weaves together home videos and other "archival" content to paint a vivid picture of Kajani as an artsy, intellectual kid who questions everything and is eager to take on the world. *See* Ex. 1 at 8:25, 11:58. The complaint also fails to describe the student documentarians in *American Skin* – key figures who drive the plot, in particular the director who becomes the twelfth juror and guides the split jury to a guilty verdict. Ex. 1 at 2:55, 1:10:30.

### d.   Plaintiffs Do Not Allege The Setting, Dialogue, Mood, Pace, or Sequence of Events is Substantially Similar

Other than the plot, theme, and characters, none of which are substantially similar in their protectable elements, Plaintiffs make no further allegations of substantial similarity. Plaintiffs do not allege the setting, dialogue, mood, pace or sequence of events is substantially similar. Nor could they:

*The setting is not substantially similar. A Routine Stop*, set in an unidentified city, begins at a lavish wedding and ends on a street corner, but the bulk of the screenplay takes place in a nondescript recording studio. Compl. Ex. A at 1-2, 5, 9-10, 84-85. On the other hand, the student filmmakers in *American Skin* follow

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Lincoln and his family around Los Angeles to their various homes, the high school Kajani attended, and the police precinct where the "trial" is held.  Ex. 1 at 29:02.

*The dialogue is not substantially similar.*  Plaintiffs fail to point to any dialogue that is similar, let alone any "'[e]xtended similarity of dialogue.'"  *Newt*, 2016 WL 4059691, at *7 (quoting *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)).  *See also Gallagher v. Lions Gate Ent. Inc.*, 2015 WL 12481504, at *10 (C.D. Cal. Sept. 11, 2015) (three instances of similar dialogue could not demonstrate "extended similarity").

*The mood, pace, and sequence of events are not substantially similar.*  *A Routine Stop* is presented in a linear format typical of narrative films, largely chronological with only one flashback to reveal the screenplay's twist ending and includes an epilogue one year later.  *See* Compl. Ex. A at 83.  On the other hand, *American Skin* is presented as a film graduate student's thesis – as if the filmmaker character created a documentary utilizing the main characters' bodycam footage, home videos, and news footage.  *See, e.g.* Ex. 1 at 0:41, 8:25, 19:35.

As discussed above, while somber to start, *A Routine Stop* conveys a message of hope – the epilogue reveals that those involved in killing Remus have been brought to justice, and Romulus is free to live a new life without his criminal record. And the screenplay incorporates moments of levity throughout, often through Romulus's partners Pooh Bear and Duck.  Compl. Ex. A at 14, 16.  *American Skin*, on the other hand, is somber from start to finish, approaching the subject matter in a more academic way.  Through the trial and jury debate, the filmmakers take the audience through a range of discussions about slavery (Ex. 1 at 51:35), class (*id.* at 57:10), institutional racism (*id.* at 52:43), patriotism (*id.* at 1:11:53), and police education (*id.* at 48:10).

Overall, once the premise of the works and the *scenes a faire* that flow from that premise, commonplace elements, and facts are disregarded, the works' protectable elements, standing alone, are not substantially similar as a matter of law.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*A Routine Stop's* and *American Skin's* plots, sequences of events, themes, characters, settings, moods, paces, and dialogue are drastically different, and thus are not substantially similar as a matter of law.

## IV.    PLAINTIFFS' SECONDARY LIABILITY CLAIMS ALSO FAIL

Plaintiffs' contributory and vicarious infringement claims against the Film Defendants fail because Plaintiffs fail to adequately allege that the Film infringes Plaintiffs' screenplay. *See Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1068 (9th Cir. 2014) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement") (internal quotation marks omitted).

## V.    CONCLUSION

Plaintiffs fail to plausibly plead access or substantially similarity of protected expression between the works at issue.  The Film Defendants respectfully request that the Court dismiss the complaint, Plaintiffs' third attempt at bringing a viable claim, in its entirety with prejudice.

DATED: January 30, 2023

DAVIS WRIGHT TREMAINE LLP
NICOLAS A. JAMPOL
CYDNEY SWOFFORD FREEMAN
RACHEL R. GOLDBERG
SAMANTHA LACHMAN

By:    /s/ Rachel R. Goldberg
        Rachel R. Goldberg

Attorneys for Defendants
NATHÁNIEL PARKER, TINY GIANT
PRODUCTIONS, LLC, ASP FILM, LLC,
TM FILM FINANCE, LLC, AND
VERTICAL ENTERTAINMENT, LLC

FILM DEFENDANTS' MOTION TO DISMISS
4877-0185-9399v.5 0118814-000001

25

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899