Joshua I. Schiller (State Bar No. 330653)
 *jischiller@bsfllp.com*
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899

Attorney for Plaintiffs
 CHANGING WORLD FILMS LLC,
 SELTON SHAW and LANGSTON SHAW

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGING WORLD FILMS LLC, SELTON SHAW, and LANGSTON SHAW, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:22-cv-09021-DSF-PLA

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Date:  March 27, 2023
Time: 1:30 p.m.
Dept.: Courtroom 7D
Judge: Hon. Dale S. Fischer |

CHANGING WORLD FILMS LLC,
SELTON SHAW, and LANGSTON
SHAW,

                    Plaintiffs,

v.

NATHANIEL PARKER a/k/a NATE
PARKER, TM FILM FINANCE LLC
d/b/a TM FILMS, TINY GIANT
PRODUCTIONS, LLC d/b/a TINY
GIANT ENTERTAINMENT,
VERTICAL ENTERTAINMENT,
LLC, SHELTON JACKSON LEE a/k/a
SPIKE LEE, and ASP FILM, LLC,

                    Defendants.

CASE NO. 2:22-cv-09021-DSF-PLA

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Date:  March 27, 2023
Time: 1:30 p.m.
Dept.: Courtroom 7D
Judge: Hon. Dale S. Fischer

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ......................................................................................2

PROCEDURAL BACKGROUND .............................................................................5

ARGUMENT ..............................................................................................................6

    A.   Plaintiffs Properly Pled a Copyright Infringement Claim
         Against Defendants .......................................................................6

       1.  Plaintiffs have suggested a reasonable possibility that
           Defendants had the chance to view and infringe
           Plaintiffs' work ...................................................................6

       2.  Whether Defendants' film is substantially similar to
           Plaintiff's screenplay is a fact-based question that
           should not be decided on a motion to dismiss ...............11

    B.   Plaintiffs Have Adequately Alleged Contributory and
         Vicarious Infringement .............................................................22

CONCLUSION..........................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*A&M Recs., Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)................................................................. 23

*Alfred v. Walt Disney Co.*,
  821 F. App'x 727 (9th Cir. 2020)...............................6, 12, 15, 16, 21

*Astor-White v. Strong*,
  733 F. App'x 407 (9th Cir. 2018)............................................................ 12

*Benay v. Warner Bros. Ent.*,
  607 F.3d 620 (9th Cir. 2010)................................................................... 11

*Boisson v. Banian, Ltd*,
  273 F.3d 262 (2d Cir. 2001) ................................................................... 13

*Cabell v. Zorro Prods. Inc.*,
  No. 5:15-CV-00771, 2018 WL 2183236 (N.D. Cal. May 11, 2018)........................ 9

*Danjaq, LLC v. Universal City Studios, LLC*,
  No. 14-02527, 2014 WL 7882071 (C.D. Cal. Oct. 2, 2014)............................22, 23

*Evans v. Warner Bros. Ent. Inc*,
  No. 18-3951, 2018 WL 6133660 (C.D. Cal. Sept. 17, 2018) ................................. 9

*Gregorini v. Apple Inc.*,
  No. 20-55664, 2022 WL 522307 (9th Cir. Feb. 22, 2022) ............................... 11, 15

*Griffin v. Peele*,
  No. EDCV1701153JGBKKX, 2017 WL 8231241 (C.D. Cal. Oct. 18, 2017) ......... 9

*Hardwell v. Parker*,
  No. CV219100, 2022 WL 16894520 (C.D. Cal. Aug. 25, 2022) ............... 13, 14, 15

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
  657 F.2d 1059 (9th Cir. 1981)................................................................... 7

*Klauber Brothers, Inc. v. City Chic Collective Ltd.*,
  No. 22-1743, 2022 WL 17184799 (C.D. Cal. Aug. 26, 2022)................................ 10

*Klauber Brothers, Inc. v. City Chic Collective Ltd.*,
    No. 22-1743, 2022 WL 18278400 (C.D. Cal. Dec. 6, 2022) .................................. 10

*Mag Jewelry Co. v. Cherokee, Inc.*,
    496 F.3d 108 (1st Cir. 2007) ................................................................. 13

*Marcus v. ABC Signature Studios, Inc.*,
    279 F. Supp. 3d 1056 (C.D. Cal. 2017) .............................................. 7, 8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ............................................................................... 22

*Newt v. Twentieth Century Fox Film Corp.*,
    No. 15-CV-02778, 2016 WL 4059691 (C.D. Cal. July 27, 2016) .................. 20, 21

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) .............................................................. 11

*Ricketts v. CBS Corps.*,
    439 F. Supp. 3d 1199 (C.D. Cal. 2020) ......................................... 20, 21, 22

*Schkeiban v. Cameron*,
    No. 12-0636, 2012 WL 12895721 (C.D. Cal. July 20, 2012) ........................ 9

*Segal v. Segel*,
    No. 20-CV-1382, 2022 WL 198699 (S.D. Cal. Jan. 21, 2022) .............. 8, 10, 11, 12

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) ......................................................... 18, 22

*Smith v. AMC Networks, Inc.*,
    No. 18-CV-03803, 2019 WL 402360 (N.D. Cal. Jan. 31, 2019) ..................... 12

*Smith v. Little, Brown & Co.*,
    245 F. Supp. 451 (S.D.N.Y. 1965) ........................................................... 9

*Star Fabrics, Inc. v. Wet Seal, Inc.*,
    No. CV1407163BROSHX, 2014 WL 12591271 (C.D. Cal. Dec. 2, 2014) ............ 9

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) ................................................................ 12

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) ............................................................ 6, 7

iii

*Webb v. Stallone,*
  910 F. Supp. 2d 681 (S.D.N.Y. 2012) ................................................................. 14, 15

*Whitehead v. Netflix, Inc.,*
  No. 22-CV-04049, 2022 WL 17342602 (N.D. Cal. Nov. 30, 2022) ...................... 12

*Williford v. City of Portland,*
  320 F. App'x 513 (9th Cir. 2009) ......................................................................... 10

*Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc.,*
  815 F. App'x 158 (9th Cir. 2020) .......................................................... 11, 15, 16

*Zindel v. Fox Searchlight Pictures, Inc.,*
  No. 18-1435, 2018 WL 3601842 (C.D. Cal. July 23, 2018) ................................... 15

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO. 2:22-cv-09021-DSF-PLA

Plaintiffs Selton Shaw, Langston Shaw, and their entertainment company Changing World Films LLC (together "Plaintiffs") submit this consolidated memorandum of points and authorities in opposition to Defendants Nathaniel Parker, Tiny Giant Productions, LLC, ASP Film, LLC, TM Film Finance LLC, and Vertical Entertainment, LLC (together "Defendants") Motion to Dismiss Plaintiffs' Complaint. For the reasons stated herein, Defendants' Motion to Dismiss should be denied.

## INTRODUCTION

The Defendants worked together to take another creator's work and pass it off as their own. For Defendant Nate Parker, in particular, he saw an opportunity in Plaintiffs' screenplay to redeem himself and return to public life after a messy scandal. Now, when confronted over their actions, Defendants are attempting to avoid liability—or, for that matter, any inquiry into the underlying facts—by making specious arguments about jurisdiction. Defendants are wrong. Plaintiffs **have** presented well-pleaded claims for infringement against each of the Defendants, and this case **should** proceed to discovery.

*First*, Plaintiffs have pled a reasonable possibility that Defendants had the chance to view Plaintiffs' work. Specifically, Plaintiffs have alleged that "Mr. Hardwick, star of *American Skin* and friend to Mr. Parker, was involved in the 2017 TV One Screenplay Competition and either provided or acted out the screenplay Plaintiffs submitted for *A Routine Stop* to Defendant Parker." The fact that Mr. Hardwick both starred in the infringing film and is a friend to Defendant Parker suggests a "reasonable possibility" that Defendants had access to Plaintiffs' screenplay.

*Second*, Plaintiffs have adequately pled that their screenplay and Defendants' film are substantially similar based on the shared plot sequence. In both works, the main character holds a police officer hostage and puts him through a show trial at gun point after the death of a loved one during a routine traffic stop. Defendants argue that

Plaintiffs' screenplay is too general or abstract a concept to receive copyright protection, but that argument overlooks the specific plot elements Plaintiffs employed in telling their original story—plot elements which Defendants stole for their own fame and profit. The Court simply cannot give credence to Defendants' argument that all works involving police officers who shoot citizens and get away with it are all the same.

Thus, despite Defendants' arguments to the contrary, Plaintiffs have adequately pleaded causes of action for infringement. Even if Defendants would dispute the facts in this case, that is all the more reason for the Court to not dismiss Plaintiffs' claims at the pleading stage and to allow the matter to proceed to discovery. To do otherwise would prevent Plaintiffs from bringing to light Defendants' wrongful actions, and it would allow infringers to escape liability from stealing the copyrighted work of rising artists.

## **FACTUAL BACKGROUND**

Plaintiffs Langston and Selton Shaw are independent filmmakers. (Compl. ¶¶ 8–9, 29.) They write, produce, and direct films through their entertainment company, Plaintiff Changing World Films, LLC. (*Id.*)  The Shaw Plaintiffs have been creating films for over fifteen years, and their work has won awards and critical acclaim. (*Id.* ¶¶ 27–31.) Plaintiff Selton Shaw's directorial debut premiered at the American Black Film Festival ("ABFF") in 2006, and Plaintiffs' subsequent work screened as an official selection at the Martha's Vineyard African-American Film Festival, the Urban Suburban Film Festival, and the Mid-Atlantic Black Film Festival. (*Id.* ¶¶ 28, 30.)

In 2017, Plaintiffs wrote a screenplay titled *A Routine Stop*. (*Id.* ¶ 32.) The copyright for the screenplay is registered under Plaintiff Changing World Films, LLC. (*Id.* ¶¶ 10, 33.) Plaintiffs' original screenplay tells the story of a Black man that takes justice into his own hands by kidnapping a white police office and putting the officer through a show trial following the death of the man's relative during a routine traffic

stop. (*Id.* ¶¶ 34–35.) Plaintiffs wrote this screenplay to address police violence against Black men and women and the country's systemic indifference to it. (*Id.* ¶ 32.)

On February 15, 2017, Plaintiffs submitted their screenplay for *A Routine Stop* to the 2017 TV One Screenplay Competition with the goal of having the screenplay produced into a feature film. (*Id.* ¶ 37.) The TV One Screenplay Competition is run by TV One, a television network, and is organized with and supported by the ABFF. (*Id.* ¶¶ 38–39.) The competition is generally judged by a team of industry professionals. (*Id.* ¶ 77.) In submitting the screenplay for *A Routine Stop*, Plaintiffs agreed to a set of terms that, among other things, stated that "TV One agrees to use reasonable efforts to keep all the Material confidential." (*Id.* ¶ 41.)

Unbeknownst to Plaintiffs, TV One disclosed several competition entries to certain actors and asked the actors to play out scenes as part of the screenplay competition. (*Id.* ¶ 77.) One of the actors who played out scenes from entries in the 2017 TV One Screenplay Competition was Omari Hardwick. (*Id.* ¶ 85.) Mr. Hardwick has close connections with the ABFF and is a friend to Defendant Parker. (*Id.* ¶¶ 79, 81.)

Ultimately, TV One did not select *A Routine Stop* as a finalist for its 2017 competition. (*Id.* ¶ 42.) Plaintiffs continued to believe that they could make *A Routine Stop* into a film, though they focused on developing other new and original projects. (*Id.*) Then, in 2019, they learned about Defendants' new film, *American Skin*. (*Id.*)

Defendants wrote, produced, distributed, and promoted *American Skin*, a 2019 winner at the Venice Film Festival. (*Id.* ¶¶ 6, 11–16.) Specifically, Defendant Parker is an American writer, director, actor, and media personality, who wrote, directed, and starred in *American Skin*. (*Id* ¶ 11.) Defendant TM Films and Tiny Giant Entertainment are film production companies that produced *American Skin*. (*Id.* ¶¶ 12–13.) Vertical Entertainment is the distributor of *American Skin*. (*Id.* ¶ 14.) ASP Film, LLC, holds the copyright for *American Skin*. (*Id.* ¶ 16.)

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO. 2:22-cv-09021-DSF-PLA

Like Plaintiffs' work, *American Skin* focuses on police violence against Black men and women and the country's systemic indifference to it. (*Id.* ¶ 4.) *American Skin* begins with the death of the main character's relative by a white police officer after a routine traffic stop. (*Id.* ¶ 5.) The main character, after learning that a grand jury decided not to indict the officer for murder, then holds the officer hostage and puts him through a show trial at gun point. (*Id.*) The trial concludes with a dramatic confession from the officer, and both works ultimately end in tragedy, with either the main character's arrest (*A Routine Stop*) or death (*American Skin*) following a last-minute act of mercy. (*Id.* ¶¶ 5, 69.)

As for characters, *A Routine Stop* and *American Skin* also share a similar cast. The main character is described as an unshaven, intelligent, Black man, and the works' supporting characters include a police captain, the mother of the deceased victim, the friend of the main character, and a prosecutor who did not indict the charged police officer. (*Id.* ¶¶ 70–74.)

Moreover, the works' loglines, representing a short synopsis that conveys the central theme and purpose of the story, both invoke the idiom "to take [something] into one's [own] hands." (*Id.* ¶¶ 56–58.) The logline for *A Routine Stop* reads: "When a cop isn't charged in the shooting death of an unarmed black man, the victim's brother takes the law **into his own hands**" (emphasis added). (*Id.* ¶ 57.) The logline for *American Skin* reads: "A Marine veteran working as a school janitor tries to mend his relationship with his son after his divorce. When his son is killed by a police officer found innocent without standing trial, he takes matters **into his own hands**" (emphasis added). (*Id.* ¶ 58.)

Defendants have profited, and continue to profit, from *American Skin*. (*Id.* ¶¶ 53–54.) The film remains available for on-demand viewing and on streaming platforms. (*Id.* ¶ 54.) For example, Defendants profit each time *American Skin* is watched on-demand or streamed online for a fee to the viewer or each time

merchandise relating to *American Skin* is sold. (*Id.*) Defendants also likely receive compensation from online streaming services (*e.g.*, Amazon Video) that stream *American Skin*. (*Id.*)

Meanwhile, Plaintiffs have not earned one dollar from their screenplay, *A Routine Stop*, that Defendants copied and pulled major characters, themes, and plot points for use in their film *American Skin*. (*Id.* ¶¶ 55–74, 82–83, 87.) Defendants had access to the screenplay for *A Routine Stop* in a number of ways, including through Mr. Hardwick, star of *American Skin* and friend to Mr. Parker, who was involved in the 2017 TV One Screenplay Competition and either provided or acted out the screenplay Plaintiffs submitted for *A Routine Stop* to Defendant Parker. (*Id.* ¶¶ 75–83.) It is also possible that an individual connected with the 2017 TV One Screenplay Competition or the ABFF made the screenplay for *A Routine Stop* available to a named defendant or Mr. Hardwick. (*Id.* ¶ 81.)

Plaintiffs have suffered monetary and irreparable harm from Defendants' actions. (*Id.* ¶ 85.) Because of Defendants' infringement, Plaintiffs have been deprived of the opportunity to be recognized and rewarded by their peers and the public for their screenplay for *A Routine Stop*. (*Id.* ¶ 86.) Plaintiffs' screenplay was also never purchased by a production or distribution company. (*Id.* ¶ 87.)

## PROCEDURAL BACKGROUND

On October 20, 2021, Plaintiffs commenced this action against Defendants in the United States District Court for the District of Columbia alleging that Defendants unlawfully copied, reproduced, published, copyrighted, and distributed Plaintiffs' screenplay for *A Routine Stop* and brought claims for direct, contributory, and vicarious copyright infringement. *Changing the World Films, LLC v. Parker*, No. 1:21-cv-02787 (D.D.C. Oct. 20, 2021) (the "DC Lawsuit"), ECF No. 1. The court did not reach the merits of Plaintiffs' claims, instead dismissing the case without prejudice for lack of personal jurisdiction. DC Lawsuit, ECF. No. 48.

This lawsuit followed on December 13, 2022. Dkt. 1. Defendants filed their Motion to Dismiss on January 30, 2023. Dkt. 20 ("MTD"). Plaintiffs have since filed a notice of dismissal without prejudice against Defendant Shelton Jackson Lee a/k/a Spike Lee. Dkt. 22.

## ARGUMENT

### A.    Plaintiffs Properly Pled a Copyright Infringement Claim Against Defendants

"To state a claim for copyright infringement, Plaintiffs must show that (1) they owned a valid copyright in their screenplay, and (2) Defendants copied protected aspects of their work." *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 728 (9th Cir. 2020). To establish copying, Plaintiffs can allege "that the defendants had 'access' to the plaintiff's work and that the two works are 'substantially similar.'" *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Plaintiffs here have claimed ownership over their screenplay (Compl. ¶ 32), that they have registered their work in accordance with statute (*id.* at ¶ 33), and that Defendants infringed their work (*id.* at ¶¶ 55–87). Defendants argue for a heightened standard of pleading that does not comport with Ninth Circuit precedent. This Court should reject their attempts to re-define this District's pleading standards and deny their motion to dismiss.

### 1.  Plaintiffs have suggested a reasonable possibility that Defendants had the chance to view and infringe Plaintiffs' work

To show access, a plaintiff must allege that the infringer had a "reasonable possibility" of viewing the protected work. *Three Boys Music Corp.*, 212 F.3d at 482. Reasonable access must be "more than a bare possibility." *Id.* (quotation omitted). A plaintiff can show that reasonable possibility if "a particular chain of events is established between the plaintiff's work and the defendant's access to that work . . . ."

*Id.* "[E]vidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant." *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 657 F.2d 1059, 1062 (9th Cir. 1981) (quotation omitted).

Here, Plaintiffs have alleged a plausible chain of events based on Defendants' connections to TV One and ABFF. (Compl. ¶ 81.) Specifically, Plaintiffs have alleged that "Mr. Hardwick, star of *American Skin* and friend to Mr. Parker, was involved in the 2017 TV One Screenplay Competition and either provided or acted out the screenplay Plaintiffs submitted for *A Routine Stop* to Defendant Parker." (*Id.*) The fact that Mr. Hardwick both worked with Defendant Parker on the infringing film and is a friend to Defendant Parker suggests a "reasonable possibility" that Defendants had the opportunity to access Plaintiffs' screenplay. *See Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1064–65 (C.D. Cal. 2017) (holding that plaintiff had adequately pled access when he submitted a script to a contest sponsored by a third party, and Will Smith was the director of the sponsoring organization and also "worked together professionally" and had a "close personal relationship" with defendant).

Defendants ask the Court to dismiss these claims because Plaintiffs "do *not* allege that *A Routine Stop* was one of the entries that Mr. Hardwick acted out, nor do they allege that Mr. Hardwick otherwise read *A Routine Stop*, nor do they explain why he would have read out or even had possession of the entire script as opposed to certain 'scenes,' nor do they explain how or why Mr. Hardwick, who was later hired to act in *American Skin,* provided Mr. Parker with their screenplay from the TV One Competition." MTD 10. But Defendants fundamentally misunderstand the pleading standard.

Because "the act of copying is rarely witnessed, copying is ordinarily established indirectly." *Kamar Int'l*, 657 F.2d at 1062.  Plaintiffs are thus not required to establish a play-by-play of Defendant Parker's unlawful acts taken behind closed

doors. Rather, Plaintiffs are "entitled to the presumption of truth" that Mr. Hardwick either provided or acted out Plaintiffs' screenplay to his friend Defendant Parker and "need not allege with the specificity one might expect from a computer forensic investigator" how Plaintiffs' work ultimately reached Defendants. *Segal v. Segel*, No. 20-CV-1382, 2022 WL 198699, at *11 (S.D. Cal. Jan. 21, 2022). "More is not required at this early stage." *Id.*

The court's decision in *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056 (C.D. Cal. 2017) is instructive on this point. There, plaintiff submitted his script to a writing contest sponsored by Overbook, a production company owned by actor Will Smith. *Id.* at 1059. Plaintiff never learned the status of his submission, but nearly two years later, ABC released a pilot for an allegedly infringing show created by Kenya Barris. *Id.* Plaintiff claimed that "Mr. Smith and Barris worked together professionally and have developed a close personal relationship," supporting the conclusion that "Mr. Smith allowed Barris access to the Script," which Barris in turn used as the basis for his show. *Id.* at 1064. Defendants disputed the fact that Smith had access to plaintiff's script and submitted a declaration accordingly. *Id.* Noting that plaintiff's allegations were disputed and "circumstantial," the court nonetheless held that such allegations "show a reasonable possibility that Defendants had access to Plaintiff's script and therefore are sufficient to survive a motion to dismiss." *Id.* at 1065. The facts are even stronger here, where Plaintiffs have claimed that Mr. Hardwick was directly involved in the screenplay competition, and Mr. Hardwick has not offered any testimony to the contrary as is typical in these cases.[1]

And even if Plaintiffs' allegations were in dispute, courts have found access on a motion for summary judgment or after a bench trial in much more limited

---

[1] For example, Defendant Spike Lee in the DC Lawsuit submitted a declaration stating that he was not involved in the 2017 TV One Screenplay Competition and had not read Plaintiffs' screenplay submission. DC Lawsuit, ECF No. 23-1 ¶ 15. Meanwhile, Defendant Parker also submitted a declaration in the DC Lawsuit, but he remained pointedly silent about the alleged infringement. *See* DC Lawsuit, ECF No. 41-2.

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO. 2:22-cv-09021-DSF-PLA

circumstances. For example, in a copyright dispute over author Isabelle Allende's "Young Zorro" novel, Ms. Allende testified that "she worked independently" and had never heard of plaintiff's "Zorro" musical scripts before the lawsuit's filing. *Cabell v. Zorro Prods. Inc.*, No. 5:15-CV-00771, 2018 WL 2183236, at *3, 9 (N.D. Cal. May 11, 2018). However, there was evidence that Ms. Allende had meetings with John Gertz, a third party with access to the plaintiff's scripts. *Id.* at *9. As a result, the court held that there was a triable issue of fact as to whether Ms. Allende had "access to the substance of Plaintiff's works" based on her testimony that, "at one point during a meeting," she and Mr. Gertz discussed Zorro's origin story. *Id.*; *see also Smith v. Little, Brown & Co.*, 245 F. Supp. 451, 454 (S.D.N.Y. 1965), *aff'd*, 360 F.2d 928 (2d Cir. 1966) (holding that defendant had access, despite defendant's testimony that she had "independently" created her novel and had never seen plaintiff's manuscript, because there was evidence that a third party had made a "casual" reference on one occasion concerning plaintiff's work to defendant). Like in *Cabell* and *Smith*, Plaintiffs should be allowed to proceed to discovery to bring Defendants' unlawful acts to light—and even at the summary judgment or trial stage, courts apply a much more lenient standard for establishing proof of access than Defendants would have this Court adopt in ruling on their motion to dismiss.

Moreover, Defendants provide no relevant support for their position; they point to caselaw that is easily distinguishable. *See Griffin v. Peele*, No. EDCV1701153JGBKKX, 2017 WL 8231241, at *6 (C.D. Cal. Oct. 18, 2017) (plaintiff admitted that the alleged chain of events was "unverifiable"); *Evans v. Warner Bros. Ent. Inc*, No. 18-3951, 2018 WL 6133660, at *1, 3 (C.D. Cal. Sept. 17, 2018) (plaintiff claimed to have given her book to "unnamed actors" and provided no other details); *Star Fabrics, Inc. v. Wet Seal, Inc.*, No. CV1407163BROSHX, 2014 WL 12591271, at *4 (C.D. Cal. Dec. 2, 2014) (plaintiff did not name a third party); *Schkeiban v. Cameron*, No. 12-0636, 2012 WL 12895721, at *1 (C.D. Cal. July 20, 2012) (plaintiff

did not indicate "who Zane is"). In contrast to those cases, Plaintiffs here have fully identified a person (Omari Hardwick) who had access to Plaintiffs' screenplay, and Plaintiffs have thus adequately pled connections between Mr. Hardwick and Defendants. (Compl. ¶ 81.)

And, to the extent Defendants rely on *Klauber Brothers, Inc. v. City Chic Collective Ltd.*, No. 22-1743, 2022 WL 17184799 (C.D. Cal. Aug. 26, 2022), the court's subsequent decisions in fact support a finding of access here. In *Klauber*, the court initially held that the plaintiff did not adequately allege access because the plaintiff had failed "to distinguish the individual activities of the purported wrongdoers by referring to them collectively as 'Defendants.'" *Id.* at *5. However, the court allowed the plaintiff to amend its complaint, and the plaintiff then alleged that (1) a third party, CCX, accessed plaintiff's designs through their prior business relationship; (2) a third party, Coltex, also displayed plaintiff's designs to its customers, and CCX was one of Coltex's potential customers; and (3) Nordstrom sold the allegedly infringing product to which CCX had access. 2022 WL 18278400, at *6–7 (C.D. Cal. Dec. 6, 2022). The court ultimately held that these allegations, which fully identified the relevant third parties, showed that both CCX and Nordstrom had access to the plaintiff's designs. *Id.* at *7. The court also rejected defendants' argument that a plaintiff must allege with specificity the transmission of its work to defendants at the pleading stage. *See id.* (holding that plaintiff was not required to specifically allege that "Nordstrom was dealing with CCX").

Therefore, this Court must reject Defendants' attempts to heighten this District's pleading standard on proof of access. Defendants fault Plaintiffs for failing to allege facts exclusively in Defendants' own control, and it would be inconsistent with Ninth Circuit precedent to dismiss Plaintiffs' claims before discovery. *See id.*; *Segal*, 2022 WL 198699, at *11 (holding that plaintiff was "not expected to have knowledge" of these facts "prior to discovery"); *see also Williford v. City of Portland*, 320 F. App'x

513, 515 (9th Cir. 2009) (requiring the court to draw all "reasonable inferences" in plaintiff's favor and noting defendant's "careful silence on the factual issue of which they alone have intimate knowledge").

### 2. Whether Defendants' film is substantially similar to Plaintiff's screenplay is a fact-based question that should not be decided on a motion to dismiss.

"[D]etermining whether works are substantially similar involves a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018). On a motion to dismiss, courts only apply the extrinsic test. *Id.* "[T]he test focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in two works." *Benay v. Warner Bros. Ent.*, 607 F.3d 620, 624 (9th Cir. 2010) (quotation omitted). But before comparing the protectable elements of the two works, "the court must 'filter out' the unprotectable elements of the plaintiff's work—primarily ideas and concepts, material in the public domain, and *scènes à faire* (stock or standard features that are commonly associated with the treatment of a given subject)." *Rentmeester*, 883 F.3d at 1118. The "analytical dissection and substantial similarity between protected elements of works are 'usually extremely close issue[s] of fact.'" *Segal*, 2022 WL 198699, at *13 (quoting *Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc.*, 815 F. App'x 158, 159 (9th Cir. 2020)).

Dismissal on the grounds of substantial similarity is thus disfavored on a motion to dismiss. *Cf. Rentmeester*, 883 F.3d at 1123 (noting that "dismissal of copyright infringement claims occurs more commonly at the summary judgment stage," particularly where "discovery could shed light" on disputed issues); *see also Gregorini v. Apple Inc.*, No. 20-55664, 2022 WL 522307, at *1 (9th Cir. Feb. 22, 2022) (noting that "even summary judgment is not highly favored on questions of substantial similarity in copyright cases" (quotation omitted)); *Zindel*, 815 F. App'x at 159 (holding that courts must be "cautious before dismissing a case for lack of substantial

similarity on a motion to dismiss"); *Alfred*, 821 F. App'x at 729 ("[A]t this stage of the litigation, it is difficult to know whether such elements are indeed unprotectible material."); *Astor-White v. Strong*, 733 F. App'x 407, 408 (9th Cir. 2018) (Wardlaw, Cir. J., concurring) (noting that "dismissal of a complaint for lack of substantial similarity before any discovery is virtually unheard of"); *Segal*, 2022 WL 19869, at *14 (declining to apply extrinsic test at pleading stage, finding that "development of the factual record, including expert testimony, would shed light on facts pertinent to the Court's analysis under the extrinsic test"); *Smith v. AMC Networks, Inc.*, No. 18-CV-03803, 2019 WL 402360, at *7 (N.D. Cal. Jan. 31, 2019) (same).

Defendants' own authority recognizes that "[t]here will be times when a court finds it plausible that the works are substantially similar and that discovery might be useful." *Whitehead v. Netflix, Inc.*, No. 22-CV-04049, 2022 WL 17342602, at *10 (N.D. Cal. Nov. 30, 2022). Therefore, "[t]he most prudent course of action is to follow Ninth Circuit precedent, which clearly states that '[t]he extrinsic test requires analytical dissection of a work and expert testimony.'" *Smith*, 2019 WL 402360, at *7 (quoting *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)).

Development of the factual record and expert testimony is particularly needed here. Defendants essentially argue that all the elements stolen from *A Routine Stop* are unprotectable, but this Court is in no position to determine whether it follows naturally that a Black man witnessing the murder of a loved one by a white police officer would decide to hold the officer hostage and put him through a show trial at gun point. In fact, as Defendants fail to discuss in their motion, the *Hardwell* court came to this same conclusion when considering Defendants' alleged infringement in that case:

> Although the concept of a "show trial" of a police officer streamed on social media does not strike the Court as *scènes à faire*, the Court admittedly is not well equipped to determine whether these elements are *scènes à faire* in dramas about police brutality. . . Here, expert testimony may assist the court in filtering protectable from

unprotectable elements. Even if these elements are unprotectable individually, it is plausible that the combination of them is original.

*Hardwell v. Parker*, No. CV219100, 2022 WL 16894520, at *5 (C.D. Cal. Aug. 25, 2022) (citations omitted).

Unable to distinguish the *Hardwell* court's decision, Defendants make legally deficient and factually incorrect arguments. First, Defendants make the unsupported argument that Plaintiffs' work is unprotectable because Defendants are also being sued for copying another, "almost identical" screenplay. MTD 15–16 (discussing *Hardwell v. Parker*, No. 2:21-cv-9100 (C.D. Cal. Nov. 19, 2021) (the "Hardwell Lawsuit")). But as a basic legal principle, "an author is entitled to copyright protection for an independently produced original work despite its identical nature to a prior work, because it is independent creation, and not novelty that is required." *Boisson v. Banian, Ltd*, 273 F.3d 262, 270 (2d Cir. 2001); *see also Mag Jewelry Co. v. Cherokee, Inc.*, 496 F.3d 108, 116 (1st Cir. 2007) (noting that "it is 'axiomatic' that separate copyrights exist in independently created designs"); Nimmer on Copyright § 2.01 (2022). Therefore, it does not matter whether elements of *A Routine Stop* also appear in the *Hardwell* screenplay. It only matters whether the plaintiffs wrote their screenplays independent of one another—which they clearly did, unlike Defendant Parker in his creation of *American Skin*.

Second, Defendants fail to note important similarities between *A Routine Stop* and *American Skin* that were *not* present in the *Hardwell* lawsuit. For example, in the course of that litigation, Defendants argued that the *Hardwell* complaint did not allege elements such as (1) how the main character or his relative were stopped by police, "beyond calling the incident 'a late night encounter,'" (2) who the main character took hostage, (3) how the show trial was conducted, or (4) a description of "the Screenplay's other characters (if any), or whether they are similar to the Film's many other important characters (for example, the student documentarians, Kajani's mother, and

Lincoln's military friends who help him conduct the trial in the police precinct)." Hardwell Lawsuit, ECF No. 13 at 13, 17. Defendants also pointed out the different timings of the officer's admission of guilt: in *American Skin*, the officer confessed "during a fully staged trial, complete with a jury of civilians, inmates, and administrative police officers," whereas in the *Hardwell* complaint, the officer allegedly confessed only *after* the main character promised to free him. *Id.* at 16. The case for substantial similarity is thus even stronger here, where Plaintiffs have alleged that in both works (1) the main character and his relative were stopped during a "routine traffic stop," (2) the main character took the white police officer involved in the shooting hostage, (3) the main character represented the prosecution at the show trial, which was conducted at gunpoint, (4) the other important characters include the main character's mother and friends who help him conduct the show trial, and (5) the officer confessed his guilt *before* he was released. (Compl. ¶¶ 5, 59–74.)

Third, Defendants incorrectly argue that because the *Hardwell* screenplay "predates" *A Routine Stop*, any stolen elements in Defendants' film "would not belong to Plaintiffs in any event." MTD 16. Defendants appear to suggest that if Defendant Parker did, in fact, use the *Hardwell* screenplay as the basis for his film, he cannot *also* be liable for stealing from another screenplay. As a factual matter, it is unclear whether Defendant Parker's knowledge of the *Hardwell* screenplay "predates" *A Routine Stop*. Defendant Parker allegedly confirmed that he had read the *Hardwell* screenplay in October 2017 (Hardwell Lawsuit, ECF No. 1 ¶ 24), but Plaintiffs here submitted their screenplay to the 2017 TV One Screenplay Competition on February 15, 2017—or eight months before (Compl. ¶ 37). And in any case, the Court cannot decide at this stage whether Defendant Parker stole from one, or possibly multiple, Black creators in his quest to return to the public eye.

Sylvester Stallone invoked a similar defense in a dispute over his film *The Expendables*, which, unsurprisingly, the court flatly rejected. *Webb v. Stallone*, 910 F.

Supp. 2d 681, 685 (S.D.N.Y. 2012), *aff'd on other grounds*, 555 F. App'x 31 (2d Cir. 2014).  In that lawsuit, Stallone claimed that he had used a different, stolen screenplay (that he had previously claimed not to have copied) as the starting point for his film. *Id.*  The court rejected this argument as smacking "more than a little of hypocrisy" and held that "[i]n the face of such inconsistency," the question of whether to credit defendant's claims was reserved for the factfinder. *Id.* at 685–686.

This Court should likewise reject Defendants' irrelevant and self-serving arguments regarding the *Hardwell* screenplay. The fact remains that when faced with similar—but notably weaker—allegations, the *Hardwell* court determined that the plaintiff had adequately pled substantial similarity sufficient to survive a motion to dismiss. 2022 WL 16894520, at *8. Plaintiffs' allegations more than meet that standard here. *See Alfred*, 821 F. App'x at 729 (holding that a screenplay survived a motion to dismiss when "the selection and arrangement of the similarities" between the screenplay and film was "more than de minimis"); *Zindel*, 815 F. App'x at 158 (holding that lower court erred in granting motion to dismiss when "reasonable minds could differ on whether there is substantial similarity"); *see also Gregorini,* 2022 WL 522307, at *1 (holding that even "summary judgment is not highly favored on questions of substantial similarity in copyright cases").

In *Zindel v. Fox Searchlight Pictures*, for example, the plaintiff alleged that the defendants' film *The Shape of Water* was substantially similar to an earlier play because both works told "the story of a lonely cleaning woman working at a laboratory that perform[ed] animal experiments for military purposes during the height of the Cold War." *Zindel v. Fox Searchlight Pictures, Inc.*, No. 18-1435, 2018 WL 3601842, at *2 (C.D. Cal. July 23, 2018). The district court granted defendants' motion to dismiss, holding that some similarities were not protectable and that "[o]ther similarities stem from those basic and unprotectable elements, such as those responsible for the testing not seeing their work as harmful or wrong." *Id.* at *7, *13.

The Ninth Circuit subsequently reversed the district court, stating: "Though both works properly were presented to the district court, additional evidence, including expert testimony, would aid in the objective literary analysis needed to determine the extent and qualitative importance of the similarities that Zindel identified in the works' expressive elements, particularly the plausibly alleged shared plot sequence." *Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc.*, 815 F. App'x 158, 160 (9th Cir. 2020) (citation omitted).

Similarly, in *Alfred v. Walt Disney Co.*, the Ninth Circuit reversed the district court for dismissing claims that the first *Pirates of the Caribbean* film infringed on plaintiff's screenplay when both works "begin with a prologue that takes place ten years prior to the main story; introduce the main characters during a battle, at gunpoint; involve treasure stories that take place on islands and in jewel-filled caves; include past stories of betrayal by a former first mate; contain fearful moments driven by skeleton crews; focus on the redemption of a young, rogue pirate; and share some similarities in dialogue and tone." 821 F. App'x at 729. The Ninth Circuit expressly rejected the district court's finding that the works shared "unprotected generic, pirate-movie tropes" because, at the motion to dismiss stage, it was "difficult to know whether such elements are indeed unprotectible material." *Id.*

This Court must not fall for Defendants' trap, as the district court did in *Zindel* and *Alfred*. Rather, this Court must consider the "plausibly alleged shared plot sequence":

- In *A Routine Stop*, twin brothers—Romulus and Remus—are pulled over by a white police officer for a routine traffic stop. During the stop, the officer shoots and kills Romulus. After a grand jury decides not to indict the officer for murder, Remus takes matters into his own hands. With the help of friends, he kidnaps the officer, holds him hostage, and puts him through a show trial at gunpoint. The officer and

prosecutor who handled the grand jury proceeding ultimately confess to working together to prevent the officer from being indicted. In the end, the police arrest Remus, his friends, the officer, and the prosecutor.

- In *American Skin*, a father—Lincoln Jefferson—and his son are pulled over by a pair of white police officers for a routine traffic stop. During the stop, one of the officers shoots and kills Lincoln's son. After a grand jury decides not to indict the officer for murder, Lincoln takes matters into his own hands. With the help of friends, he storms the police station and holds hostage the police officer responsible for his son's death—along with several others, including staff and prisoners—putting him through a show trial at gunpoint. The officer confesses that he profiled Lincoln and his son, and that he shot the son because he was scared and fell back on his training. In the end, Lincoln "executes" the officer, with a gun that is empty, and a sniper kills Lincoln.

(Compl. ¶ 5.)

Defendants argue that Plaintiffs' work is unprotectable because the plot "follows naturally that a man who watched an officer walk away from killing a loved one without consequence would 'feel betrayed by the justice system,' and might 'decide to take matters into his own hands.'" MTD 16. But Defendants' argument is a sleight of hand: their description of the two works is far too general and is akin to describing Defendant Parker's other movie, *Birth of a Nation*, as just another movie about slavery. A police officer escaping criminal charges for shooting an unarmed man is part of the plot for both works, yes. But equally important is the element of retributive justice that comes from a close family member of the deceased kidnapping the police officer and putting him through a show trial, a trial that occurs during an

armed standoff with police and culminates in a confession. Likewise, both films set their stories amidst the timely conversation about racial profiling, the relationship between the Black community and the police, and how the American justice system fails to hold police officers accountable for the killings of unarmed Black citizens. One element does not "follow[] naturally" from either of the others, and Defendants' attempt to paint the two works as just a collection of unoriginal tropes is flawed. Both works contain specific, deliberately chosen plot elements and sequences of events that are creative decisions and that cannot be waved away as clichés or mere *scenes a faire*.

Thus, even if, for the sake of argument, the Court considers that none of the "plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression." *Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990), *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). Indeed, despite Defendants' arguments to the contrary, the similarities between the two works go far beyond the "general" and "superficial" (MTD 20); there are marked, specific similarities in how the plot progresses, specific events that take place, and even in what characters appear in the two works. In both works:

- A Black man's close family member is killed during a routine traffic stop by a white police officer. (Compl. ¶ 5.)

- The white police officer who kills the unarmed black man is not charged with murder. (*Id.* ¶ 59.)

- The main character feels betrayed by the justice system and decides to take matters into his own hands to get street justice. (*Id.* ¶ 60.)

- The main character, with a group of his friends, kidnaps the white police officer involved in the shooting. (*Id.* ¶ 61.)

- The main character holds the white police officer hostage. (*Id.* ¶ 5.)

- The main character puts the white police office on trial for the murder he committed. (*Id.* ¶ 62.)

- The white police officer's trial is presented as a show trial. (*Id.* ¶ 5.)

- The main character represents the prosecution in the trial. (*Id.* ¶ 63.)

- The white officer involved in the shooting has a wife and a young son. (*Id.* ¶ 64.)

- At the beginning of the trial, the white officer who is charged says that the main character has no authority to charge him. (*Id.* ¶ 65.)

- The main character is armed with a handgun for the entire trial. (*Id.* ¶ 66.)

- The white police officer on trial explains that he was just trying to make it home. (*Id.* ¶ 67.)

- The white police officer offers a confession implicating himself and exposing the systemic racism of the police department. (*Id.* ¶ 5.)

- The main character puts his gun to the head of the white police officer to kill him after the officer is found guilty. (*Id.* ¶ 68.)

- At the last minute the main character decides not to kill the white police officer. (*Id.* ¶ 69.)

- The main character is depicted as feeling helpless and betrayed by the criminal justice system and taking matters into his own hands. (*Id.* ¶ 70.)

- The main character is described as an unshaven, intelligent Black man who has strong views on justice. (*Id.*)

- The main character's friend is portrayed as rough and with nothing to lose. (*Id.* ¶ 73.)

- One of the supporting characters is a police captain who tries to end the standoff without violence. (*Id.* ¶ 71.)

- One of the supporting characters is a prosecutor who does not indict the police officer involved in the shooting. (*Id.* ¶ 74.)

If the Court were to adopt Defendants' position and hold that Plaintiffs' screenplay is not original based on the frequency of police brutality, where would that leave other Black artists and creators who write original stories tied to police brutality? Is their work unprotected because it might stem from a shared trauma, regardless of the specific plot elements they use? Defendants point to two examples of action-thriller films featuring vigilante justice to argue that the plot of *A Routine Stop* is generic (MTD 16 n.5), but those films are not dramas on *racial* injustice. Defendants would have this Court ignore the original way Plaintiffs addressed the pain and suffering of their community by comparing their work to films that are over ten years old, in different genres, and completely unrelated to the very important issue of police brutality.

A closer look at Defendants' cited caselaw reveals similar defects. Defendants rely on *Ricketts v. CBS Corps.,* 439 F. Supp. 3d 1199, 1212–13 (C.D. Cal. 2020), *aff'd sub nom. Ricketts v. Berlanti Prods.*, No. 20-55912, 2022 WL 1046252 (9th Cir. Apr. 7, 2022) to argue that all of Plaintiffs' alleged similarities are unprotectable. MTD 14. But, unlike in *Ricketts*, Plaintiffs here have alleged more than a shared basic plot premise of a "rags to riches" story. *See id.* ("The plot similarities end there. . . In Plaintiff's Works, the protagonist is wrongly accused of rape and is beaten by the police. . . On the other hand, the central plot point of the Series is the relationship between the protagonist and the football coach, who is secretly the protagonist's father."). Similarly, Defendants' reliance on *Newt v. Twentieth Century Fox Film Corp.*, No. 15-CV-02778, 2016 WL 4059691 (C.D. Cal. July 27, 2016), is misplaced. MTD 14. There, the court held that a "documentary" about a ""pimp' running a prostitution ring in San Francisco" was not substantially similar to *Empire*, a television series focusing on the power struggle amongst a Black family in the music business. *Id.* at *3–4. Besides plot elements involving drug dealing and sons that were pursuing a music career, the plaintiff had failed to establish any other similar plot elements. *Id.*

at *4–6 (identifying thirteen different major plot elements between the works). Therefore, Plaintiffs' "plausibly alleged shared plot sequence" here is more akin to the Ninth Circuit's decisions in *Zindel* and *Alfred* than to the district court's findings in *Ricketts* and *Newt*.

Defendants also cite *Ricketts* in support of the proposition that the shared traits of the main characters are too "general" to be protectable. MTD 20. However, Defendants' parenthetical badly misconstrues this Court's holding. Defendants cherry-pick the alleged similarities, while ignoring a slew of major differences:

> The protagonists of the two works are similar at the abstract level – they are both young, African-American men who are from disadvantaged neighborhoods and play football. *Yet the two characters have very different motivations.*
>
> *For Blake, it is the coach's statement that he could become the starting quarterback and take the team to the NCAA championship that "sparks a dormant flame within [him]," while for Spencer, it is his mom and her financial struggles that convince him to play football in Beverly Hills. . . Plaintiff also concedes a number of differences. For example, Plaintiff contends that "Spencer is violent, and 'offered a way out', unlike Blake who discourages violence and sought to 'earn his way out.'" Further, Plaintiff notes that the initial act of gun violence has little effect on Spencer, while the shooting that killed Blake's cousin and injured his brother is a major element of his character. In addition, Blake has a "small-town-southern-accent, diction and demeanor," while Spencer is from Crenshaw in Los Angeles.*
>
> The fact that both characters wear the number 11 is not sufficient to establish substantial similarity. Similarly, that both players have a similar build, size and shape, naturally stems from the basic plot point of a young star football player.

*Ricketts,* 439 F. Supp. 3d at 1215–16 (emphasis added to show text omitted by Defendants) (internal citations omitted). Defendants do not dispute that the main characters here are motivated by the same "need for justice" (MTD 17)—which easily

distinguishes this case from the plaintiff's allegations in *Ricketts*. *See id.* (finding that the "two characters have very different motivations").

In sum, this Court should reject Defendants' attempt to catalogue the minute differences between the two works in favor of focusing on their overall similarities, including the works' loglines, themes, plotlines, and characters. *See Shaw*, 919 F.2d at 1363 (holding that a plaintiff may succeed even when the "copied portion" is "relatively small in proportion to the entire work" where that copied portion is "qualitatively important"); (Compl. ¶¶ 55–74). And to the extent there are any disputes about the similarity of the film and screenplay, they only raise factual questions— including, for example, whether Defendant Parker began with a direct copy of Plaintiffs' screenplay and then began to make superficial changes in order to hide his theft of another creator's work. Such disputes present questions to be answered in discovery rather than to be resolved at the pleading stage.

## B. Plaintiffs Have Adequately Alleged Contributory and Vicarious Infringement

Notably, Defendants all but concede that secondary liability exists in this case, addressing it in a single throwaway paragraph (MTD 25) that entirely relies on their direct infringement argument.

"One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (citations omitted). "[T]hese doctrines of secondary liability emerged from common law principles and are well established in the law." *Id.* (citation omitted).

"The elements of a contributory infringement claim are (1) knowledge of a third party's infringing activity, and (2) induces, causes, or materially contributes to the infringing product." *Danjaq, LLC v. Universal City Studios, LLC*, No. 14-02527, 2014

WL 7882071, at *7 (C.D. Cal. Oct. 2, 2014) (quotation omitted). The knowledge requirement includes both those with actual knowledge and those who "have reason to know" of direct infringement. *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) (quotation omitted). As for vicarious liability, a defendant may be held liable if he "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Id.* at 1022 (quotation omitted).

Plaintiffs have clearly alleged that Defendants are infringing on their screenplay and have plausibly alleged Defendants' participation in the promotion and distribution of the film. (Compl. ¶¶ 50, 54.) Thus, because Plaintiffs have plausibly alleged contributory and vicarious infringement against Defendants, this Court should deny the motion and allow Plaintiffs to take discovery. *See Danjaq*, 2014 WL 7882071, at *7.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs request that this court deny Defendants' motion to dismiss.

DATE: February 27, 2023      Respectfully submitted,

/s/ *Joshua I. Schiller*

Joshua I. Schiller (State Bar No. 330653)
 jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899

*Attorney for Plaintiffs Changing World Films LLC, Selton Shaw, and Langston Shaw*