1  NICOLAS A. JAMPOL (State Bar No. 244867)
     nicolasjampol@dwt.com
2  SAMANTHA LACHMAN (State Bar No. 331969)
     samlachman@dwt.com
3  DAVIS WRIGHT TREMAINE LLP
   865 South Figueroa Street, 24th Floor
4  Los Angeles, California  90017-2566
   Telephone:  (213) 633-6800
5  Fax:  (213) 633-6899

6  JOHN D. FREED (State Bar No. 261518)
     jakefreed@dwt.com
7  SARAH E. BURNS (State Bar No. 324446)
     sarahburns@dwt.com
8  DAVIS WRIGHT TREMAINE LLP
   50 California Street, Suite 2300
9  San Francisco, California  94111
   Telephone:  (415) 276-6500
10 Fax:  (415) 276-6599

11 Attorneys for Defendants
   NATHANIEL PARKER, TINY GIANT
12 PRODUCTIONS, LLC, ASP FILM, LLC,
   TM FILM FINANCE, LLC, AND
13 VERTICAL ENTERTAINMENT, LLC

14

15                **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17

18 | CHANGING WORLD FILMS LLC, SELTON SHAW, and LANGSTON SHAW, | Case No. 2:22-cv-09021-DMG-PVC |

**DECLARATION OF JAKE FREED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

19 SHAW,

20                   Plaintiffs,

21        vs.

22 NATHANIEL PARKER *a/k/a* NATE
   PARKER, TM FILM FINANCE LLC
23 *d/b/a* TM FILMS, TINY GIANT
   PRODUCTIONS, LLC *d/b/a* TINY
24 GIANT ENTERTAINMENT,
   VERTICAL ENTERTAINMENT, LLC,
25 SHELTON JACKSON LEE *a/k/a* SPIKE
   LEE, and ASP FILM, LLC,

26                   Defendants.

27

28

# DECLARATION OF JAKE FREED

I, Jake Freed, declare as follows:

1.      I am an attorney admitted to practice before all courts of the State of California and before this Court.  I am a counsel in the law firm of Davis Wright Tremaine LLP ("DWT"), and I am one of the attorneys representing Defendants Nathaniel Parker, Tiny Giant Productions, LLC, ASP Film, LLC, TM Film Finance, LLC, and Vertical Entertainment, LLC (collectively, "Defendants") in this matter. The facts stated below are based on my own personal knowledge.

2.      On October 28, 2024, I contacted Plaintiffs' counsel to schedule a conference pursuant to Local Rule 7-3.  I wrote that Defendants hoped to discuss the grounds for and substantive legal arguments in support of Defendants' anticipated motion for summary judgment.  Plaintiffs' counsel did not respond.  I emailed Plaintiffs' counsel again on October 30, 2024 to provide more detail on the motion, for meet-and-confer purposes.  Plaintiffs' counsel responded on November 4, 2024.  I had a telephone call with Plaintiffs' counsel the morning of November 5, 2024 to discuss the grounds in support of Defendants' motion.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of Plaintiffs' May 10, 2024 amended responses and objections to Defendants' First Set of Interrogatories.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of Plaintiffs' September 29, 2023 First Set of Requests for Production to Defendants.

5.      Plaintiffs never noticed a deposition for Defendant Nate Parker.

6.      Plaintiffs did not serve subpoenas on TV One, ABFF Ventures LLC ("ABFFV"), or Omari Hardwick.

7.      Defendants served document requests and interrogatories on Plaintiffs, issued subpoenas to TV One and ABFFV, and deposed Selton Shaw and the corporate Plaintiff, Changing the World Films, LLC.  A true and correct copy of

1

excerpts from the deposition of Selton Shaw and Changing the World Films, LLC is attached as **Exhibit 3**.

      8.     Plaintiffs served a subpoena on June 27, 2024 to Avan Hardwell, who had voluntarily dismissed his case against Defendants on August 24, 2023.  *See Avan Hardwell v. Nathaniel Parker et al*., Case No. 2:23-cv-02478-DMG-PVC, Dkt. 16.  The subpoena sought documents from Mr. Hardwell relating to "the terms and conditions for the settlement and/or dismissal" of his litigation.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on the 5th day of November, 2024, in San Francisco, California.


_____
      */s/ Jake Freed*
        Jake Freed

FREED DECLARATION IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

EXHIBIT 1

Joshua I. Schiller (CA Bar No. 330653)
jischiller@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899

Benjamin Margulis (admitted *pro hac vice*)
bmargulis@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 446-2300
Fax: (212) 446-2350

Gina A. Rossman (admitted *pro hac vice*)
grossman@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131

Leonard Bennett (admitted *pro hac vice*)
leonard@bblegal.net
**BENNETT & BENNETT LAW GROUP, LLC**
5000 Sunnyside Avenue, No. 101
Beltsville, MD 20705
Tel: (240) 398-3140
Fax: (240) 398-3140

*Attorneys for Plaintiffs*
*Changing World Films, LLC, Selton Shaw,*
*and Langston Shaw*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGING WORLD FILMS, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NATHANIEL PARKER, et al.,<br><br>Defendants. | Case No. 22-cv-09021-DMG-PVC<br><br>**PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES TO PLAINTIFFS, SET NO. ONE** |

| | | |
|---|---|---|
| 1 | Propounding Party: | Defendants Nathaniel Parker, TM Film Finance LLC, Tiny |
| 2 | | Giant Productions, LLC, Vertical Entertainment, LLC, and |
| 3 | | ASP Film LLC |
| 4 | Responding Party: | Plaintiffs Selton Shaw, Langston Shaw, and Changing |
| 5 | | World Films, LLC |
| 6 | Set No.: | One |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiffs Selton Shaw, Langston Shaw, and Changing World Films, LLC ("Plaintiffs") hereby submit the following Amended Responses and Objections to Defendants Nathaniel Parker, TM Film Finance LLC, Tiny Giant Productions, LLC, Vertical Entertainment, LLC, and ASP Film, LLC's ("Defendants") Interrogatories to Plaintiffs, Set One. Plaintiffs reserve the right to amend or supplement these responses in the future in accordance with Fed. R. Civ. P. 26(e)(1) as may be necessary or appropriate.

**PRELIMINARY STATEMENT**

These Responses to Defendants' Interrogatories to Plaintiffs ("Interrogatories," each individually an "Interrogatory") are based on the investigation and discovery that have thus far been completed. To the extent information is provided, these Responses and Objections ("Responses") are based upon the facts and information now known to Plaintiffs, and do not constitute admissions or representations that additional information responsive to these Interrogatories does not exist. Plaintiffs' investigation and discovery are continuing. Therefore, Plaintiffs furnish the following responses to these Interrogatories without prejudice to, and explicitly reserve, Plaintiffs' right to supplement, modify, clarify, or otherwise amend their Responses or to produce evidence at trial as to any other documents or facts.

1

**GENERAL OBJECTIONS**

2      Plaintiffs make their objections to the Interrogatories by, among other things,

3  fully incorporating by reference the following General Objections:

4      1.      Plaintiffs object to the Interrogatories to the extent they call for the

5  disclosure of information protected by the attorney-client privilege, the work product

6  doctrine, the common interest privilege, the settlement privilege, or any other

7  applicable privilege, immunity, statute, regulation or rule.  Plaintiffs will not provide

8  any responses that would intrude upon such privileges.  The inadvertent disclosure of

9  any privileged information or production of any privileged information or documents

10  shall not be deemed to be a waiver of any applicable privilege with respect to such

11  information or documents or any other information provided or documents produced.

12      2.      Plaintiffs object to the Interrogatories to the extent they seek

13  information not necessary to the prosecution or defense of this action, and to the

14  extent they are not reasonably calculated to lead to the discovery of relevant

15  admissible evidence.

16      3.      Plaintiffs object to the Interrogatories, including the Definitions and

17  Instructions, to the extent they impose obligations of disclosure beyond those

18  required by the Federal Rules of Civil Procedure, this Court's Local Rules, the

19  Standing Order of Hon. Dolly M. Gee, and relevant case law.

20      4.      Plaintiffs object to the Interrogatories to the extent they are vague,

21  ambiguous, confusing, irrelevant, incomprehensible or duplicative.

22      5.      Plaintiffs object to the Interrogatories to the extent they are overly

23  broad, cumulative, oppressive, unduly burdensome, vexatious or intended to harass

24  rather than lead to the discovery of evidence related to a bona fide dispute between

25  the parties.

26      6.      Plaintiffs object to the Interrogatories to the extent they do not specify

27  the information sought with reasonable particularity.

28

7.     Plaintiffs object to the failure to define terms in the Interrogatories (beyond the terms included in the "Definitions" section thereof), which renders certain of the Interrogatories vague and ambiguous.

8.     Plaintiffs object to the Interrogatories to the extent they seek disclosure of information not within Plaintiffs' knowledge, possession, custody or control. Plaintiffs answer according to their reasonable information and belief as of the date of these responses.

9.     Plaintiffs object to the Interrogatories to the extent they seek production of information obtainable from more convenient, less burdensome, or less expensive sources.

10.    In responding to the Interrogatories, Plaintiffs neither waive nor intend to waive, but expressly reserve, any and all objections to the relevance, competence, susceptibility to discovery, materiality or admissibility of any information or documents provided.

11.    Neither an indication that information or documents will be produced nor an objection to a particular Interrogatory indicates that information responsive to that Interrogatory exists, nor does it indicate that Plaintiffs agree with the language, interpretations, descriptions, or characterizations contained in Defendants' Interrogatory.  By agreeing to comply with a particular Interrogatory, Plaintiffs represent only that they have conducted a reasonably diligent search and, subject to all objections, will produce non-objectionable, non-privileged information responsive thereto, if any.

12.    Plaintiffs make these responses based upon their knowledge as of the date of these responses, and expressly reserve the right to modify and supplement any or all of their responses and objections should they discover additional information responsive to the Interrogatories prior to, through, and including the trial

1  of this action, and to introduce into evidence at trial, hearing or other proceedings in

2  this action information discovered subsequent to the date of these responses.

3          13.    Plaintiffs submit these responses without conceding the relevance or

4  materiality of the subject matter of any information produced or Interrogatory

5  propounded.  Should Plaintiffs provide any information in response to the

6  Interrogatories subject to any of the foregoing General Objections or to any further

7  specific objections articulated below, such provision of information is not intended to

8  be, nor shall it be, deemed a waiver of all such objections.

9          14.    The inadvertent disclosure of any information which is confidential or

10  references confidential or proprietary information, or is privileged, or was prepared

11  in anticipation of litigation or for trial, shall not constitute a waiver of any

12  confidentiality or privilege or of any other ground for objection to discovery with

13  respect to such information or the subject matter thereof, or of Plaintiffs' right to

14  object to the use of such document or information contained therein during the trial

15  of this matter.

16          15.    Discovery is ongoing in this matter, and the following responses are

17  based on Plaintiffs' present state of recollection, knowledge and belief.  These

18  responses are subject to additional or different information that discovery may

19  disclose, and as such, Plaintiffs reserve the right to supplement these objections and

20  responses as they discover additional information.  Plaintiffs also reserve the right to

21  rely on facts, documents, or other evidence that may develop or come to their

22  attention at a later time.

23          16.    Plaintiffs object to the Interrogatories because they are not limited as to

24  time period.

25

26

27

28

**SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES**

Subject to and without waiver of the foregoing General Objections and conditions, which apply to each Interrogatory as if set forth fully below, Plaintiffs make the following specific responses and objections:

**INTERROGATORY NO. 1:**

State all facts supporting YOUR allegation in Paragraph 81 of the COMPLAINT that "Defendants [] had access to the screenplay for *A Routine Stop* in a number of ways through either TV One or ABFF."

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs object to this Interrogatory as vague and overbroad. Plaintiffs further object to this Interrogatory as premature, as it seeks the disclosure of information "supporting" allegations while discovery is still ongoing. Plaintiffs further object to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Plaintiffs further object to this Interrogatory to the extent it seeks information already in Defendants' possession, custody, or control. Plaintiffs also object to this Interrogatory to the extent it is duplicative of Defendants' Request For Production No. 4 ("All DOCUMENTS YOU contend support YOUR allegation in Paragraph 81 of the COMPLAINT that "Defendants [] had access to the screenplay for A Routine Stop in a number of ways through either TV One or ABFF.").

Plaintiffs also object to this Interrogatory on the ground that the word "supporting" is vague, ambiguous, and undefined, thereby rendering this Interrogatory unduly vague and burdensome.

Subject to the foregoing objections and based on the current stage of this litigation, Plaintiffs respond to this Interrogatory by stating that Omari Hardwick (who starred in Defendants' film) has close connections with the ABFF and was a

1  judge at the TV ONE COMPETITION, and further direct Defendants to the language
2  of the COMPLAINT

3  **INTERROGATORY NO. 2:**

4       State all facts supporting YOUR allegation that Omari Hardwick had access to
5  YOUR SCREENPLAY.

6  **RESPONSE TO INTERROGATORY NO. 2:**

7       Plaintiffs object to this Interrogatory as vague and overbroad.  Plaintiffs
8  further object to this Interrogatory as premature, as it seeks the disclosure of
9  information "supporting" allegations while discovery is still ongoing.  Plaintiffs
10 further object to this Interrogatory to the extent that it seeks information protected
11 from disclosure by the attorney-client privilege and/or the work-product doctrine.
12 Plaintiffs further object to this Interrogatory to the extent it seeks information already
13 in Defendants' possession, custody, or control.  Plaintiffs further object to this
14 Interrogatory to the extent that it calls for Plaintiffs to form and/or come to a legal
15 conclusion at this stage of the litigation.

16      Plaintiffs also object to this Interrogatory on the ground that the words
17 "supporting" and "access" are vague, ambiguous, and undefined, thereby rendering
18 this Interrogatory unduly vague and burdensome.

19      Subject to the foregoing objections and based on the current stage of this
20 litigation, Plaintiffs respond to this Interrogatory by stating that Omari Hardwick
21 (who starred in Defendants' film) has close connections with the ABFF and was a
22 judge at the TV ONE COMPETITION, and further direct Defendants to the language
23 of the COMPLAINT

24

25

26

27

28

**INTERROGATORY NO. 3:**

State all facts supporting YOUR allegation that Omari Hardwick shared the details of YOUR SCREENPLAY with any Defendant.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs object to this Interrogatory as vague and overbroad.  Plaintiffs further object to this Interrogatory as premature, as it seeks the disclosure of information "supporting" allegations while discovery is still ongoing.  Plaintiffs further object to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Plaintiffs further object to this Interrogatory to the extent it seeks information already in Defendants' possession, custody, or control.

Plaintiffs also object to this Interrogatory on the ground that the words "supporting," "shared," and "details" are vague, ambiguous, and undefined, thereby rendering this Interrogatory unduly vague and burdensome.

Subject to the foregoing objections and based on the current stage of this litigation, Plaintiffs respond to this Interrogatory by stating that Omari Hardwick (who starred in Defendants' film) has close connections with the ABFF and was a judge at the TV ONE COMPETITION, and further direct Defendants to the language of the COMPLAINT.

**INTERROGATORY NO. 4:**

Describe any and all COMMUNICATIONS you had with any PERSON affiliated with the TV ONE COMPETITION relating to YOUR SCREENPLAY, whether in person, by telephone, or by electronic means.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiffs object to this Interrogatory as vague and overbroad.  Plaintiffs further object to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine.

1   Plaintiffs further object to this Interrogatory to the extent it seeks information already

2   in Defendants' possession, custody, or control.  Plaintiffs further object to this

3   Interrogatory as being in the nature of a request for production.  Plaintiffs further

4   object to this Interrogatory as being duplicative of Defendants' Request For

5   Production No. 3 ("All DOCUMENTS reflecting COMMUNICATIONS with any

6   PERSONS employed by the ABFF or TV ONE COMPETITION, relating to the

7   SCREENPLAY.").

8        Plaintiffs also object to this Interrogatory on the ground that the terms "any

9   and all," "affiliated," and "relating" are vague, ambiguous, and undefined, thereby

10  rendering this Interrogatory unduly vague and burdensome.

11       Given the foregoing objections (including the General Objections), Plaintiffs

12  shall not respond to this Interrogatory, and direct Defendants to the documents that

13  will be produced in response to Defendants' Requests for Production of Documents,

14  Set No. One.

15       Plaintiffs are open to meeting and conferring with Defendants about this

16  Interrogatory.

17  **INTERROGATORY NO. 5:**

18       Describe any and all COMMUNICATIONS you had with any PERSON

19  affiliated with the ABFF relating to YOUR SCREENPLAY, whether in person, by

20  telephone, or by electronic means.

21  **RESPONSE TO INTERROGATORY NO. 5:**

22       Plaintiffs object to this Interrogatory as vague and overbroad.  Plaintiffs

23  further object to this Interrogatory to the extent that it seeks information protected

24  from disclosure by the attorney-client privilege and/or the work-product doctrine.

25  Plaintiffs further object to this Interrogatory to the extent it seeks information already

26  in Defendants' possession, custody, or control.  Plaintiffs further object to this

27  Interrogatory as being in the nature of a request for production.  Plaintiffs further

28

object to this Interrogatory as being duplicative of Defendants' Request For Production No. 3 ("All DOCUMENTS reflecting COMMUNICATIONS with any PERSONS employed by the ABFF or TV ONE COMPETITION, relating to the SCREENPLAY.").

Plaintiffs also object to this Interrogatory on the ground that the terms "any and all," "affiliated," and "relating" are vague, ambiguous, and undefined, thereby rendering this Interrogatory unduly vague and burdensome.

Given the foregoing objections (including the General Objections), Plaintiffs shall not respond to this Interrogatory, and direct Defendants to the documents that will be produced in response to Defendants' Requests for Production of Documents, Set No. One.

Plaintiffs are open to meeting and conferring with Defendants about this Interrogatory.

**INTERROGATORY NO. 6:**

Identify each and every instance in which YOU provided YOUR SCREENPLAY, or any version of YOUR SCREENPLAY, to any PERSON prior to the 2019 premiere of *American Skin*, including the identity of any such PERSON(s) and the date(s) on which you provided such PERSON(s) a copy of YOUR SCREENPLAY.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiffs object to this Interrogatory as vague and overbroad. Plaintiffs further object to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Plaintiffs further object to this Interrogatory to the extent it seeks information already in Defendants' possession, custody, or control. Plaintiffs further object to this Interrogatory as being in the nature of a document request. Plaintiffs further object to this Interrogatory on the ground that it seeks discovery that is not proportional to

1 the needs of this case, particularly in seeking discovery into "each and every"

2 instance" and "any PERSON" to receive "any" copy of YOUR SCREENPLAY.

3 Plaintiffs further object to that portion of this Interrogatory that begins with

4 "including the identity . . ." and ending with "a copy of YOUR SCREENPLAY," as

5 being in the nature of a request for production and not an Interrogatory.

6      Plaintiffs also object to this Interrogatory on the ground that the terms "each

7 and every," "any version," "2019 premier," "provided," and "copy" are vague,

8 ambiguous, and undefined, thereby rendering this Interrogatory unduly vague and

9 burdensome.

10      Given the foregoing objections (including the General Objections), Plaintiffs

11 respond to this Interrogatory by stating that they submitted their Screenplay to the

12 TV ONE COMPETITION "prior to the 2019 premier of *American Skin*," and further

13 direct Defendants to the language of the COMPLAINT.

14 **INTERROGATORY NO. 7:**

15      State all festivals or competitions that YOU submitted YOUR SCREENPLAY

16 to, including the names and years of those festivals or competitions.

17 **RESPONSE TO INTERROGATORY NO. 7:**

18      Plaintiffs object to this Interrogatory as vague and overbroad.  Plaintiffs

19 further object to this Interrogatory to the extent that it seeks information protected

20 from disclosure by the attorney-client privilege and/or the work-product doctrine.

21 Plaintiffs further object to this Interrogatory to the extent it seeks information already

22 in Defendants' possession, custody, or control.  Plaintiffs further object to this

23 Interrogatory as being in the nature of a document request.  Plaintiffs further object

24 to this Interrogatory on the ground that it seeks discovery that is not proportional to

25 the needs of this case, particularly in seeking discovery into "all festivals or

26 competitions" to which "YOU submitted YOUR SCREENPLAY."  Plaintiffs also

27 object to that portion of this Interrogatory that reads "including the names and years

28

1  of those festivals or competitions," as being in the nature of a request for production

2  and not an Interrogatory.

3      Plaintiffs further object to this Interrogatory on the ground that the terms

4  "festivals" and "competitions" are vague, ambiguous, and undefined, thereby

5  rendering this Interrogatory unduly vague and burdensome.

6      Given the foregoing objections (including the General Objections), Plaintiffs

7  respond to this Interrogatory by stating that they submitted their Screenplay to the

8  TV ONE COMPETITION "prior to the 2019 premier of *American Skin*," and further

9  direct Defendants to the language of the COMPLAINT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | DATE: May 10, 2024                    Respectfully submitted,

2                                         */s/ Joshua I. Schiller*

3                                         Joshua I. Schiller (CA Bar No. 330653)
                                          jischiller@bsfllp.com
4                                         BOIES SCHILLER FLEXNER LLP

5                                         44 Montgomery Street, 41st Floor
                                          San Francisco, CA 94104
6                                         Tel: (415) 293-6800

7                                         Fax: (415) 293-6899

8
                                          Benjamin Margulis (*pro hac vice*)
9                                         bmargulis@bsfllp.com

10                                        BOIES SCHILLER FLEXNER LLP
                                          55 Hudson Yards
11                                        New York, NY 10001

12                                        Tel: (212) 446-2300
                                          Fax: (212) 446-2350
13

14                                        Gina A. Rossman (*pro hac vice*)
                                          grossman@bsfllp.com
15                                        BOIES SCHILLER FLEXNER LLP

16                                        1401 New York Ave, NW
                                          Washington, D.C. 20005
17                                        Tel: (202) 237-2727

18
                                          Leonard Bennett (*pro hac vice*)
19                                        leonard@bblegal.net

20                                        BENNETT & BENNETT LAW
                                          GROUP, LLC
21                                        5000 Sunnyside Avenue, No. 101

22                                        Beltsville, MD 20705
                                          Tel: (240) 398-3140
23                                        Fax: (240) 398-3140

24
                                          *Attorneys for Plaintiffs Changing World*
25                                        *Films, LLC, Selton Shaw, and Langston*
                                          *Shaw*
26

27

28

PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES, SET
NO. ONE
CASE NO. 2:22-cv-09021-DMG-PVC

## **VERIFICATION**

I, Selton Shaw, declare that I am a Plaintiff in the above-titled action. I have read PLAINTIFFS' AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES TO PLAINTIFFS, SET NO. ONE and know the contents thereof. I am informed and believe that the matters stated therein are true and, on that ground, verify such matters are true. Plaintiffs reserve the right to amend or supplement said responses.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 10, 2024, in Washington, DC.

_Selton Shaw_
DocuSigned by:
9ABD7B815DA841A...
Selton Shaw

# EXHIBIT 2

Joshua I. Schiller (CA Bar No. 330653)
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800
Fax: (415) 293-6899
jischiller@bsfllp.com

Benjamin Margulis (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 446-2300
Fax: (212) 446-2350
bmargulis@bsfllp.com

Gina A. Rossman (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, D.C. 20005
Tel: (202) 237-2727
grossman@bsfllp.com

Leonard Bennett (*pro hac vice
forthcoming*)
**BENNETT & BENNETT LAW
GROUP, LLC**
5000 Sunnyside Avenue, No. 101
Beltsville, MD 20705
Tel: (240) 398-3140
Fax: (240) 398-3140
leonard@bblegal.net

*Attorneys for Plaintiffs Changing World Films,
LLC, Selton Shaw, and Langston Shaw*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHANGING WORLD FILMS, LLC, et al.,<br><br>            Plaintiffs,<br><br>  v.<br><br>NATHANIEL PARKER, et al.,<br><br>            Defendants. | Civil Action No. 22-cv-09021-DMG-PVC<br><br>**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS NATHANIEL PARKER, TM FILM FINANCE LLC, TINY GIANT PRODUCTIONS, LLC, VERTICAL ENTERTAINMENT LLC, AND ASP FILM, LLC** |

| | |
|---|---|
| 1 | Propounding Party:   Plaintiffs Selton Shaw, Langston Shaw, and Changing World Films, LLC (together "Plaintiffs") |
| 2 | Responding Party:   Defendants Nathaniel Parker *a/k/a* Nate Parker, TM |
| 3 | Film Finance LLC      *d/b/a* TM Films, Tiny Giant |
| 4 | Productions, LLC *d/b/a* Tiny Giant Entertainment, |
| 5 | Vertical Entertainment, LLC, and ASP Film (together "Defendants"), |
| 6 | Set No.:   One |

Pursuant to Fed. R. Civ. P. Rules 26 and 34 that Defendants Nathaniel Parker *a/k/a* Nate Parker, TM Film Finance LLC *d/b/a* TM Films, Tiny Giant Productions, LLC *d/b/a* Tiny Giant Entertainment, Vertical Entertainment, LLC, and ASP Film (together "Defendants"), produce or permit inspection and copying of the following documents, in accordance with Rule 34 and the accompanying definitions and instructions, at the offices of **BOIES SCHILLER FLEXNER LLP, 44 Montgomery Street 41st Floor San Francisco, CA 94104**, within thirty (30) days of service of this request.

## DEFINITIONS

The following Definitions apply to the Requests and are deemed to be incorporated into each of the Requests. Nothing set forth below is intended to narrow the scope of discovery that is permitted by Rule 34 and the Definitions and Requests should be read as broadly as permitted by the Rule 34.

1. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of any Request all responses that might otherwise be construed to be outside of its scope.

2. The terms "all," "any," and "each" shall be construed as encompassing all.

3. The term "communication" shall mean, without limitation, every manner of transmitting, transferring, exchanging or sharing information, facts, opinions, inquiries, or thoughts in any form, whether orally, in writing, or otherwise, by any means whatsoever, including without

limitation by oral communication, face-to-face meeting, memorandum, letter, mail, telephone, facsimile transmission, email, text message, instant message, or any other means.

4.      The terms "concerning" and "regarding" shall be construed in the broadest sense possible to include describing, referring to, reflecting, comprising, evidencing, including, discussing, mentioning, or constituting in whole or in part.

5.      The term "document" shall have the broadest meaning possible, and includes all written, printed, typed, reported, recorded, pictorial, or graphic matter, however produced or reproduced, now or at the time of possession, custody or control, including all letters, email transmissions, text messages, instant messages, cables, telephone records, notations, invoices, ledgers, journals, formal and informal books of record and account, logs, studies, summaries, minutes, agendas, bulletins, notices, announcements, charts, manuals, models, graphs, instructions, financial statements, photographs, videotapes, other film or tapes, reports, brochures, publications, books, memoranda, notes, notebooks, drafts, worksheets, contracts, agreements, proposed contracts or agreements (whether or not actually consummated), computer data, computer printouts, graphics, statistics, interoffice memos, tape recordings, transcriptions, drafts of the foregoing items, articles of newspapers, magazines, other publications, lists, proposals, plans, specifications, addenda, statements, receipts, calendars, and copies or reproductions of the foregoing upon which notations in writing have been made which do not appear on the originals.

6.      The term "person" shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

7.      The terms "You," "Your," and "Yours" shall refer to Defendants unless otherwise specified.

8.      "This Matter" means the matter captioned as *Changing World Films, LLC v. Parker*, No. 22-09021 (C.D. Cal.).

9.      "Plaintiffs' Work" means the work that is the subject of U.S. Copyright Registration No. PA0002314277 (*A Routine Stop*) and identified in paragraph 33 and Exhibit A of Plaintiffs' complaint in This Matter.

10.     "Defendants' Work" means the work titled "American Skin" identified in (a) paragraph 47 of Plaintiffs' complaint in This Matter, and (b) paragraph 7 of the Declaration of Nathaniel Parker in Support of Film Defendants' Motion to Dismiss the First Amended Complaint [Dkt. 41-2] in the matter *Changing the World Films, LLC v. Parker*, No. 21-2787 (D.D.C.), including any and all versions and drafts of the work, as well as any works incorporating, including, or derived from the work, which include (without limitation) the pitch, treatment, screenplay, and script for the film *American Skin*.

11.     "Produces" means Lukas Behnken, Tarak Ben Ammar, Mark Burg, R.D. Delgado, Van Hayden, Spike Lee, Christopher Lockhart, George Loucas, Michael Novogratz, Jane Oster Sinisi, David Oyelowo, Bob Sargsyan, Vaagn Sarkissyan, Zak Tanjeloff, Dwight Wilson II, Sean Wolfington

12.     The "Screenplay Competition" means the TV One Screenplay Competition run by TV One, including (without limitation) the 2017 TV One Screenplay Competition.

13.     "Hardwell Matters" means the matters captioned as (a) *Hardwell v. Parker*, No. 21-09100 (C.D. Cal.), and (b) *Hardwell v. Parker*, No. 23-2478 (C.D. Cal.).

14.     "Venice Festival" shall mean the Venice Film Film Festival, including (without limitation) the 2019 Venice Film Festival.

## **INSTRUCTIONS**

The following Instructions apply to each of the Requests set forth herein, and are deemed to be incorporated into each of the Requests.

1.     Unless otherwise specified, these Requests cover the time period from January 1, 2016 to the present.

2.     The Requests are continuing in nature.  In the event that the Parker Defendants become aware of responsive communications, documents or information in addition to, or inconsistent with, that which the Parker Defendants have previously produced to Plaintiffs, prompt supplementation of the Parker Defendants' response(s) to these Requests is required.

3.     The Parker Defendants must supplement or correct their disclosure, response, or production of documents in a timely manner if the Parker Defendants learn that in some material

respect the disclosure, response, or the production is incomplete or incorrect, and if the additional or corrective information or production has not otherwise been made known to Plaintiffs during the discovery process.

4.      The Parker Defendants are required to furnish all information in their possession, custody, or control, regardless of whether such information is possessed directly by the Parker Defendants or its officers, managers, agents, employees, representatives, or any other person acting for or on behalf of them.

5.      The Parker Defendants shall retain all of the original documents for inspection or copying throughout the pendency of This Matter and any related proceedings.

6.      Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a document is a responsive document in its own right and must be produced.

7.      Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its plain, ordinary and usual meaning except where such words have a usual custom and usage definition, in which case they shall be interpreted in accordance with such usual and custom usage definition of which the Parker Defendants are aware.

8.      All documents must be produced in a form that renders them susceptible to copying and electronic scanning.

9.      All documents shall be produced as they are maintained in the file, folder, envelope, or other container in which the documents are kept or maintained.  If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

10.     Documents attached to each other should not be separated.

11.     Each document should be segregated and identified by the Request to which it is primarily responsive or produced as it is kept in the ordinary course of business.

12.     For any responsive documents or communications stored in electronic format, including email, the Parker Defendants will produce those documents or communications in searchable electronic format (e.g., single-page .tiff format with corresponding OCR or full-text

files) on CD-ROMs, DVD-ROMs, portable or external hard drives or other widely-used electronic or optical storage media. All Microsoft Excel and PowerPoint documents will be produced in native format, and Plaintiffs reserve the right, as needed, to seek production of additional documents, communications, or categories of documents or communications in native format. All responsive electronic documents and communications will be produced with sufficient metadata to convey where these items begin and end (including attachments), the original file name, and the original timestamps and attributes. Production of electronically stored information may be subject to an ESI Protocol that may be agreed to or so-ordered in the future.

13.     If identical copies of a document are in the possession, custody, or control of more than one natural person or other document custodian, a copy of that document shall be produced from each such natural person or other document custodian.

14.     In instances where two or more exact duplicates of any document exist, the most legible copy shall be produced.

15.     If any of the documents requested herein are no longer in the Parker Defendants' possession, custody, or control, identify each such requested document by date, type of document, the person(s) from whom sent, the person(s) to whom sent, and the person(s) receiving copies, and provide a summary of the document's contents.

16.     The fact that a document is in the possession of the Parker Defendants, or is produced by another person, does not relieve the Parker Defendants of the obligation to produce all of its copies of the same document, even if the Parker Defendants' copies are identical in all respects to a document produced or held by any other person.

17.     Other than redactions of privileged information, and/or as addressed by any ESI Protocol, documents are to be produced in full and may not be redacted in any manner.

18.     With respect to all documents that the Parker Defendants are withholding in whole or in part, on the basis of an asserted privilege or immunity from discovery, state separately with respect to each document the privilege claimed, the basis for your claim of privilege, all authors and recipients of the document for which the privilege is claimed, and the general subject matter of

the information for which the privilege is claimed, in sufficient detail to permit an assessment of the applicability of the asserted privilege or immunity.

19.     If the Parker Defendants find any Request or any term used in a Request to be vague, ambiguous, subject to varying interpretations, or unclear, state what portion of the Request or term the Parker Defendants find to be vague, ambiguous, subject to varying interpretations, or unclear and state the construction employed by the Parker Defendants in responding to the Request.

20.     Should the Parker Defendants object to any Request on any basis, please state whether the Parker Defendants are withholding any responsive documents on the basis of such objection.

21.     The terms defined above and the individual Requests should be construed broadly to the fullest extent of their meaning.

22.     The past tense shall include the present tense and vice versa.

23.     Plaintiffs reserve the right to propound additional Requests for the production of documents.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

### **REQUEST FOR PRODUCTION NO. 1:**

A copy of each draft or version of Defendants' Work, including, but not limited to, all works that are substantially similar to Defendants' Work.

### **REQUEST FOR PRODUCTION NO. 2:**

All documents concerning Defendants' conception, development, and creation of Defendants' Work, including but not limited to all drafts, notes, communications, or other documents Defendants referenced or created when conceiving, developing, and creating Defendants' Work.

### **REQUEST FOR PRODUCTION NO. 3:**

Documents sufficient to show the date range when and the location where Defendant Nate Parker conceived of, drafted, revised, edited, and finished the screenplay for *American Skin*.

**REQUEST FOR PRODUCTION NO. 4:**

1       Documents sufficient to show all persons involved in the conception, development,

2  creation, or distribution of Defendants' Work and each person's role in connection with the

3  work's conception, development, or creation, including (without limitation) documents sufficient

4  to identify each and every person who worked on Defendants' Work, contributed to Defendants'

5  Work, or in any way helped, assisted, or otherwise contributed to developing, drafting, editing,

6  refining, finalizing, marketing, distribution, or filming of Defendants' Work.

7  **REQUEST FOR PRODUCTION NO. 5:**

8       All contracts and other agreements concerning the conception, development, or creation of

9  Defendants' Work.

10  **REQUEST FOR PRODUCTION NO. 6:**

11       All documents concerning any attempts by or plans of Defendants to register Defendants'

12  Work or any work including or incorporating Defendants' Work with the U.S. Copyright Office,

13  including but not limited to all documents concerning any decision to file or not to file an

14  application for registration and copies of all documents submitted to or received from the U.S.

15  Copyright Office in connection with such application.

16  **REQUEST FOR PRODUCTION NO. 7:**

17       Documents sufficient to show all persons or entities involved in the reproduction,

18  publication, distribution, public display, advertisement, sale, or other exploitation of Defendants'

19  Work.

20  **REQUEST FOR PRODUCTION NO. 8:**

21       All contracts and agreements concerning the reproduction, publication, distribution, public

22  display, advertisement, sale, or other exploitation of Defendants' Work.

23  **REQUEST FOR PRODUCTION NO. 9:**

24       All documents concerning any business plans or projections concerning use or

25  exploitation of Defendants' Work.

26

27

28

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to identify all media, venues, and distribution channels in or through which Defendants' Work was or will be published or otherwise made available to the public.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents concerning Defendants' advertisement and promotion of Defendants' Work, including representative samples of each type of advertisement and promotional material.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to identify any person actually or intended to be employed, retained, or engaged by Defendants to advertise or promote the sale or availability of Defendants' Work.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to identify or describe the actual and target purchasers of or audience for Defendants' Work.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show all sources of revenues received or expected to be received by Defendants from use, sale, licensing, or other exploitation of Defendants' Work.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to identify each price at which Defendants' Work was or is expected to be licensed, sold, or otherwise exploited.

**REQUEST FOR PRODUCTION NO. 16:**

All financial statements, profit and loss statements, net income statements, balance sheets, financial forecasts, projections, internal memoranda, ledgers, journals, bookkeeping entries, and business plans showing revenues actually or expected to be received from licensing, sale, or other exploitation of Defendants' Work.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to show all costs and expenses incurred by Defendants in connection with the creation, production, distribution, use, advertisement, sale, licensing, or other exploitation of Defendants' Work, including but not limited to any and all costs and expenses

Defendants claim should be deducted from net revenues to determine its net profits resulting from the Defendants' Work.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents on which Defendants intend to rely to prove deductible expenses attributable to and net profits resulting from Defendants' Work.

**REQUEST FOR PRODUCTION NO. 19:**

All Documents on which Defendants intend to rely to prove that any portion of revenues from the sale, licensing, or exploitation of Defendants' Work are not attributable to infringement of Plaintiffs' Work.

**REQUEST FOR PRODUCTION NO. 20:**

All documents concerning copies of Plaintiffs' Work that are or have ever been in the Defendants' possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 21:**

All documents concerning Defendants' knowledge or awareness of Plaintiffs or Plaintiffs' Work, including, but not limited to, all documents showing how and when Defendants became aware of or obtained access to Plaintiffs' Work.

**REQUEST FOR PRODUCTION NO. 22:**

All documents concerning communications between Defendants and Omari Hardwick about Plaintiffs, Plaintiffs' Work, or Defendants' Work.

**REQUEST FOR PRODUCTION NO. 23:**

All documents concerning communications between Defendants and any third party about the Screenplay Competition.

**REQUEST FOR PRODUCTION NO. 24:**

All documents concerning communications between Defendants and any third party about Plaintiffs or Plaintiffs' Work.

**REQUEST FOR PRODUCTION NO. 25:**

All documents concerning any searches performed by Defendants or on Defendants' behalf of the U.S. Copyright Office's records for Plaintiffs' Work, any other works registered by Plaintiffs, or any works similar or related to Plaintiffs' Work or Defendants' Work.

**REQUEST FOR PRODUCTION NO. 26:**

All documents not otherwise requested herein concerning Plaintiffs or Plaintiffs' Work.

**REQUEST FOR PRODUCTION NO. 27:**

All documents concerning studies, surveys, investigations, research, development, analyses, or opinions concerning Plaintiffs' Work, including, but not limited to, any such documents comparing Defendants' Work and Plaintiffs' Work or concerning any similarities between Defendants' Work and Plaintiffs' Work.

**REQUEST FOR PRODUCTION NO. 28:**

All documents concerning newspaper, magazine, newsletter, trade journal, website, or other media coverage concerning Defendants' Work.

**REQUEST FOR PRODUCTION NO. 29:**

All documents concerning any opinion letter, analysis, or other communication concerning whether Defendants have the right to create or otherwise exploit the Defendants' Work.

**REQUEST FOR PRODUCTION NO. 30:**

All documents that support or refute any claim by Defendants that their infringement of Plaintiffs' Work was not willful.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to show any communications sent by or lawsuits filed by any third party claiming that Defendants committed copyright infringement.

**REQUEST FOR PRODUCTION NO. 32:**

All documents Defendants intend to rely on in support of their defense in This Matter.

**REQUEST FOR PRODUCTION NO. 33:**

Documents sufficient to show the terms of any insurance coverage for This Matter, including (without limitation) the amount of coverage.

**REQUEST FOR PRODUCTION NO. 34:**

Documents sufficient to show the terms of any insurance coverage for the Hardwell Mater as well as any insurance payments relating to the Hardwell Matter.

**REQUEST FOR PRODUCTION NO. 35:**

Documents sufficient to show the relationship between TVOne and each defendant individually.

**REQUEST FOR PRODUCTION NO. 36:**

Documents sufficient to show the relationship between Defendant Nate Parker and TVOne, including whether Defendant Parker ever has been remunerated by TVOne or ever has served on a jury for a TVOne competition.

**REQUEST FOR PRODUCTION NO. 37:**

All documents relating to Plaintiffs, Plaintiffs' Work, and/or This Matter, including, without limitation, all communications by, between, or on behalf of any of the Defendants relating to Plaintiffs, Plaintiffs' Work, and/or This Matter.

**REQUEST FOR PRODUCTION NO. 38:**

All documents relating to the Hardwell Matters, the allegations asserted in each of the pleadings filed in the Hardwell Matters, and/or the Avan Hardwell, including, without limitation, all communications by, between, or on behalf of any of the Defendants relating to Hardwell Matters, the allegations asserted in each of the pleadings filed in the Hardwell Matters, and/or the Avan Hardwell.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and communications from, to, or between any of the Defendants and any of the Producers relating to Defendants' Work, Plaintiffs' Work, Plaintiffs, or This Matter, including (without limitation) the distribution of Defendants' Work.

PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTSSET ONE,
CASE NO.: 22-cv-09021-DMG-PVC

**REQUEST FOR PRODUCTION NO. 40:**

All documents and communications relating to the screening, marketing, and/or distribution of Defendants' Work at the Venice Festival, including (without limitation) all documents relating to Spike Lee.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and communications by, between, and among any of the Defendants and Spike Lee (*a/k/a* Shelton Jackson Lee), relating to the Defendants' Work, Plaintiffs' Work, Plaintiffs, or This Matter.

DATE: September 29, 2023       Respectfully submitted,

1

2                                   */s/ Joshua I. Schiller*

3                                   Joshua I. Schiller (CA Bar No. 330653)
BOIES SCHILLER FLEXNER LLP

4     44 Montgomery Street, 41st Floor
San Francisco, CA 94104

5     Tel: (415) 293-6800
Fax: (415) 293-6899

6     jischiller@bsfllp.com

7     Benjamin Margulis (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP

8     55 Hudson Yards
New York, NY 10001

9     Tel: (212) 446-2300
Fax: (212) 446-2350

10    bmargulis@bsfllp.com

11

12    Gina A. Rossman (*admitted pro hac vice*)
BOIES SCHILLER FLEXNER LLP

13    1401 New York Ave, NW
Washington, D.C. 20005

14    Tel: (202) 237-2727
grossman@bsfllp.com

15

16    Leonard Bennett (*pro hac vice forthcoming*)
BENNETT & BENNETT LAW GROUP,
LLC

17    5000 Sunnyside Avenue, No. 101

18    Beltsville, MD 20705
Tel: (240) 398-3140

19    Fax: (240) 398-3140
leonard@bblegal.net

20

21    *Attorneys for Plaintiffs Changing World*
*Films, LLC, Selton Shaw, and Langston*

22    *Shaw*

23

24

25

26

27

28

PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTSSET ONE,
CASE NO.: 22-cv-09021-DMG-PVC

# EXHIBIT 3

CONFIDENTIAL

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3
       CHANGING WORLD FILMS, LLC,     )
 4     SELTON SHAW, and LANGSTON      )
       SHAW,                          )
 5                                    )
                    Plaintiffs,       )
 6                                    )
       VS.                            )          Case No.
 7                                    ) 2:22-cv-09021-DMG-PVC
                                      )
 8     NATHANIEL PARKER a/k/a NATE    )
       PARKER, TM FILM FINANCE, LLC,  )
 9     d/b/a TM FILMS, TINY GIANT     )
       PRODUCTIONS, LLC, d/b/a TINY   )
10     GIANT ENTERTAINMENT, VERTICAL  )
       ENTERTAINMENT, LLC, SHELTON    )
11     JACKSON LEE a/k/a SPIKE LEE,   )
       and ASP FILM, LLC,             )
12                                    )
                    Defendants.       )
13
14                    * CONFIDENTIAL *
15     TELECONFERENCE 30(b)(6) DEPOSITION OF CHANGING WORLD FILMS
16                  BY SELTON HAITH SHAW
17        TAKEN REMOTELY ON BEHALF OF THE DEFENDANTS
18                   IN WASHINGTON, DC
19                 ON SEPTEMBER 27, 2024
20            REPORTED BY:  DAVID BUCK, CSR
21
22
23
24
25
                                              Page 1
```

CONFIDENTIAL

```
 1                  A P P E A R A N C E S
 2
 3       For the Plaintiffs:        Benjamin Margulis
         (By Videoconference)       BOIES SCHILLER FLEXNER,
 4                                   LLP
                                     55 Hudson Yards
 5                                   New York, NY 10001
                                     (212)446-2300
 6                                   bmargulis@bsfllp.com
 7
 8       For the Plaintiffs:        Gina A. Rossman
         (By Videoconference)       BOIES SCHILLER FLEXNER,
 9                                   LLP
                                     1401 New York Avenue NW
10                                   Washington, DC 20005
                                     (202)237-2727
11                                   grossman@bsfllp.com
12
13       For the Defendants:        John D. Freed
         (By Videoconference)       DAVIS WRIGHT TREMAINE, LLP
14                                   50 California Street
                                     Suite 2300
15                                   San Francisco, CA 94111
                                     (415)276-6500
16                                   jakefreed@dwt.com
17
18
19
20
21
22
23
24
25
                                                 Page  2
```

CONFIDENTIAL

1                  S T I P U L A T I O N S

2

3              IT IS HEREBY STIPULATED AND AGREED by

4      and among the attorneys for the respective parties

5      hereto that the deposition of CHANGING WORLD FILMS BY

6      SELTON HAITH SHAW may be taken on behalf of the Defendants

7      on the 27th of September, 2024, in Washington, DC, by David

8      Buck, Certified Shorthand Reporter for the State of

9      Oklahoma, taken pursuant to Notice.

10             IT IS FURTHER STIPULATED AND AGREED by

11     and among the attorneys for the respective parties

12     hereto that all objections, except as to the form of

13     the question and the responsiveness of the answer, are

14     reserved until the time of trial, at which time they

15     may be made with the same force and effect as if made

16     at the time of the taking of this deposition.

17                         * * * * * *

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
1                     CONTENTS
2                                              Page
3      Direct Examination By Mr. Freed            5
4      Cross-Examination By Ms. Rossman          94
5      Redirect Examination By Mr. Freed         95
6      Reporter's Certificate                    99
7
8
9                  Index of Exhibits
10                                             Page
11     Exhibit 1        Amended Notice to Changing World   12
                        Films, LLC
12
       Exhibit 2        LinkedIn Page for Selton Shaw      13
13
       Exhibit 3        Exhibit A, A Routine Stop          19
14
       Exhibit 4        Bates SHAW_000001-000007           23
15
       Exhibit 5        Bates SHAW_000008--000009          26
16
       Exhibit 6        Complaint for Copyright            48
17                      Infringement
18     Exhibit 7        Plaintiff's Amended Responses and  76
                        Objections to Interrogatories,
19                      Set No. One
20     Exhibit 8        Plaintiff's Amended Responses and  86
                        Objections to Request for
21                      Production, Set No. One
22
23
24
25
                                            Page  4
```

CONFIDENTIAL

```
 1          A.   I guess it's a printout of my LinkedIn
 2     information.
 3          Q.   Okay.  So, it says there your education is
 4     Hampton University.
 5               Do you see that?
 6          A.   Yes.
 7          Q.   Did you attend Hampton University?
 8          A.   Yes.
 9          Q.   Did you get a degree from Hampton University?
10          A.   I did.
11          Q.   What was the degree?
12          A.   Political science.
13          Q.   When, when did you get it?
14          A.   2005.
15          Q.   Okay.  And then it says that your experience
16     is Changing World Films, LLC screenwriter slash
17     director January 2011 to the present.
18               Do you see that?
19          A.   Yes.
20          Q.   Is it accurate that you have -- well, let me
21     ask it this way.  What do you do for Changing World
22     Films, LLC or the company?
23          A.   Well, stopping short of saying I do it all,
24     but, you know, create, direct, write, produce original
25     films.  Obviously, you know, there's some, you know,
```

Page 14

CONFIDENTIAL

```
 1              A.  Correct.

 2              Q.  And was that the case back in the 2017 time

 3       period as well, that you had a full time job and did

 4       the work for the company on top of the full time job?

 5              A.  Correct.

 6              Q.  Okay.  So, I'm going to ask a little bit about

 7       the company.  So, we have several Plaintiffs in this

 8       case and I'm just trying to figure out what each one's

 9       role is here.  I don't have too many questions but I

10       just want to know a little bit about the company.

11                     So, the company, what does the company do?

12              A.  So we write, direct and produce feature films.

13       We do consulting on other films with other producers.

14       We occasionally do video and production and editing

15       work.  I would say all of those things in the sort of

16       video production space would kind of encapsulate what

17       our company does.

18              Q.  What is your role at the company?  Do you have

19       a title or what --

20              A.  Well, I mean, I would say my title is partner.

21       I mean, but essentially kind of what it says on here,

22       I screenwriter, I direct, edit, you know, sort of

23       spearhead the projects, you know, with me and my

24       brother.  It's a -- you know, there are times where,

25       you know, you do whatever is necessary, you know, when
```

                                            Page 17

CONFIDENTIAL

1      you're, you know, when you're a business owner.

2          Q.   I completely understand.

3               Does the company have any employees?

4          A.   Outside of myself and my brother, no.   When we

5      make projects, you know, you may hire someone

6      temporarily, but in terms of like full on staff

7      employees outside of me and my brother, no.

8          Q.   Back in 2017 did the company have anyone

9      working, you know, any employees besides you and your

10     brother?

11         A.   No, I don't think so.

12         Q.   What is your brother's role with the company?

13         A.   My brother is a producer.   He's also the other

14     partner.   He's a producer, he's an actor.   He also

15     just helps, you know -- in the creative space it's,

16     you know, it's a marathon, and so he helps with a

17     number of those other creative avenues of the

18     business.

19         Q.   Does the company have any other -- strike

20     that.

21               Who is the owner of the company?

22         A.   I would say we're co-owners of the company.

23         Q.   Does anybody else have an ownership share of

24     the company?

25         A.   No.

                                          Page 18

CONFIDENTIAL

```
 1        Q.  Okay.  Let's set aside Exhibit 2 and now I'll
 2   mark Exhibit 3.  And that's going to be your A Routine
 3   Stop screenplay.
 4            (Defendant's Exhibit Number 3 marked for
 5            identification purposes and made part of the
 6            record.)
 7        Q.  (By Mr. Freed) Okay.  I don't have any
 8   questions about what's in it but I just want to verify
 9   what it is.  So Mr. Shaw, have you seen this document
10   before?
11        A.  Absolutely.
12        Q.  What is it?
13        A.  A Routine Stop screenplay I wrote.
14        Q.  Did anybody else help you write it?
15        A.  No.
16        Q.  Did your brother Langston have any role or
17   responsibility with respect to writing this
18   screenplay?
19        A.  No, but we bounce ideas off each other.  So, I
20   was at the typewriter, I mean typewriter, keyboard,
21   but, you know, we -- again, in the creative process
22   we're constantly, you know, bouncing ideas off, but in
23   terms of writing it, I did write it.
24        Q.  So, for the rest of today, and this is sort of
25   the central thing in your case for today, I'm going to
```

Page 19

CONFIDENTIAL

 1    call this the screenplay to keep it simple.  Is that

 2    okay with you?

 3         A.  Okay.

 4         Q.  And if we talk about any other screenplay

 5    that's not this one I will specify.

 6              So, Mr. Shaw, when did you write this

 7    screenplay?

 8         A.  I believe I started writing it in '16 and I

 9    believe I finished it in '17.

10         Q.  Are you aware of something called the 2017 TV

11    One screenplay competition?

12         A.  Yes.

13         Q.  Going forward for today I'm going to call that

14    the 2017 competition so it's less of a mouthful.  Is

15    that okay with you?

16         A.  Yes.

17         Q.  Okay.  Thank you.

18              What is the 2017 competition?

19         A.  It was a screenwriting competition put on by

20    TV One and ABFF.

21         Q.  What is TV One?

22         A.  It's a cable television channel.

23         Q.  Were you familiar with TV One before you --

24    well, strike that, we have other questions to get to

25    first.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1        preliminary question.  Did you submit the screenplay
 2        to the 2017 competition?
 3             A.  Yes.
 4             Q.  Why did you do that?
 5             A.  It was a great competition.  It was an
 6        opportunity to have your film produced, so that was
 7        intriguing because any competitions are just
 8        competitions whereas this particular one if you win
 9        you get your film produced.
10             Q.  Did you submit the screenplay to any other
11        competitions at any time?
12             A.  No.
13             Q.  So this document here, Exhibit 4, did you fill
14        out the data that appears here, the contact, the
15        contact e-mail, the screenwriter name, all of that
16        stuff you see there on Page 1?
17             A.  Yes.
18             Q.  Can I ask you to scroll to Page 7 of this
19        document?  And review the content at the top there,
20        screen writer bio one.
21             A.  Yes, I see it.
22             Q.  Is that an accurate bio for you as of 2017?
23             A.  Yes.
24             Q.  And you wrote this bio that appears here?
25             A.  Yes, I did.
```

Page 24

CONFIDENTIAL

1    Q.   Okay.   If you scroll down there is a judges
2  feedback option.   Did you see that there?
3    A.   Uh-huh.
4    Q.   And you said no to paying $50 for judge
5  feedback.   Is that right?
6    A.   Yes.
7    Q.   Was there a reason you turned down the
8  feedback opportunity?
9    A.   At the time maybe I don't know if I saw the --
10  necessarily saw the value in it, hindsight maybe I
11  should have.   But I think this was free, I think it
12  was free to enter and so I think I just went with the
13  free option, you know, versus, you know, paying the
14  50.
15    Q.   I understand.
16        And then if you go back to Pages 5 and 6,
17  on the top of five it has a signature there that
18  appears to be yours.   Is that your signature?
19    A.   Yes.
20    Q.   And then sort of at the middle of the page it
21  says, screenplay uploaded information.   Is it correct
22  that you submitted a copy of the screenplay, a 12 page
23  table read scene selection and a logline in connection
24  with this submission?
25    A.   Yes, those are some of the things I submitted.

Page 25

CONFIDENTIAL

```
1        A.  Yes, yes, I have.

2        Q.  What are they?

3        A.  When I was filling out the information to send

4   to the competition, this I guess eight was sent to me

5   at some point, was e-mailed to me at some point and

6   then once I submitted it I guess the other one was

7   sent.

8        Q.  Okay.  So the second one, I think that's page

9   ending in Bates number 9 --

10       A.  Yes.

11       Q.  -- that's an e-mail from TV One screenplay

12  competition to you on Wednesday, February 15, 2017 at

13  1:12 p.m.  Is that correct?

14       A.  Yes.

15       Q.  So, is it your understanding that on February

16  15 -- well, strike that.

17           So, is it accurate that you submitted your

18  screenplay and those supporting documents that we

19  talked about in Exhibit 4 on February 15th, 2017?

20       A.  Yes.  I believe that was the day it went

21  through.

22       Q.  Okay.  Did you send your screenplay or any

23  information about your screenplay to the 2017

24  competition at any other time?

25       A.  No.  This was the only way to send it.
```

Page 27

CONFIDENTIAL

1      submitted it?

2            A.  Follow up how?

3            Q.  Contact by phone?

4            A.  No, no, no.  No.  No.

5            Q.  Okay.  You mentioned Nate Parker a minute ago.

6      You named him as a Defendant in this case.  Correct?

7            A.  Correct.

8            Q.  Have you ever met Nate Parker?

9            A.  No.

10           Q.  Have you ever communicated with him in any

11     way?

12           A.  No, not directly.

13           Q.  Did you ever provide the screenplay to him?

14           A.  Not directly, no.

15           Q.  Are you aware of anyone who provided the

16     screenplay to him?

17           A.  I'm aware of what I believe, you know, the

18     path of how he got my screenplay, but beyond that I'm

19     not sure.

20           Q.  What is it that you believe about the path

21     that he got your screenplay?

22           A.  I believe that I submitted it to this

23     competition in 2017 and then I believe that he came

24     out with the same movie.  So, I believe that between

25     submitting it and him coming out with the movie that

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1          he got the screenplay.

2               Q.   Okay.   We'll come back to that issue.   For now

3     let's talk about the other Defendants.   You named TM

4     Film Finance, LLC as a Defendant.   Correct?

5               A.   Yes.

6               Q.   Do you know any representatives of TM Film

7     Finance?   And I mean sort of the executives or

8     employees or owners.

9               A.   No.

10              Q.   Did you ever provide the screenplay to anybody

11    associated with TM Film Finance?

12              A.   Not to my knowledge, no.

13              Q.   Are you aware of anyone who provided the

14    screenplay to TM Film Finance?

15              A.   To my knowledge, no.

16              Q.   Okay.   You've also named Tiny Giant

17    Productions, LLC as a Defendant.   Correct?

18              A.   Yes.

19              Q.   Do you know any representatives of Tiny

20    Giant's owners, executives, employees?

21              A.   No.

22              Q.   Did you ever provide the screenplay to anyone

23    affiliated Tiny Giant Productions?

24              A.   To my knowledge, no.

25              Q.   Are you aware of anyone who provided the

                                                    Page 33

CONFIDENTIAL

```
 1       screenplay to Tiny Giant Productions?
 2            A.   To my knowledge, no.
 3            Q.   Okay.   You named Vertical Entertainment, LLC
 4       as a Defendant.   Correct?
 5            A.   Correct.
 6            Q.   Do you know any representatives, owners,
 7       executives or employees of Vertical?
 8            A.   No.
 9            Q.   Did you ever provide the screenplay to anybody
10       affiliated with Vertical?
11            A.   To my knowledge, no.
12            Q.   Are you aware of anyone who provided the
13       screenplay to anybody affiliated with Vertical?
14            A.   I'm not sure.
15            Q.   Any thought one way or the other?
16            A.   If someone provided it I'm not aware.
17            Q.   Okay.   The last Defendant, you named ASP Film,
18       LLC as a Defendant.   Correct?
19            A.   Yes.
20            Q.   Do you know any representatives, owners,
21       executives or employees of ASP Film?
22            A.   No.
23            Q.   Did you ever provide the screenplay to anybody
24       affiliated with ASP Film?
25            A.   To my knowledge, no.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1    sorry, strike that.

2              Do you know whether somebody associated

3    with the 2017 competition gave the screenplay to Mr.

4    Parker?

5         A.  I believe I know who gave him the screenplay.

6         Q.  Who do you believe that is?

7         A.  I believe it's the costar in the film, Mr.

8    Hardwick.

9         Q.  Why do you believe Mr. Hardwick gave Mr.

10   Parker the screenplay?

11        A.  Because Mr. Hardwick has had a relationship

12   with TV One, ABFF for over a decade and he has served

13   previously as a judge and a panelist in competitions

14   similar to mine.  And then he subsequently pops up as

15   the costar of my film repackaged.  So that's why I

16   believe that.

17        Q.  Do you know for a fact that Mr. Hardwick was

18   involved with the 2017 competition specifically?

19        A.  Well, he was at ABFF in 2017.

20        Q.  How do you know that?

21        A.  There's numerous press releases of him being

22   there in 2017.

23        Q.  Have you seen those press releases?

24        A.  Yes.

25        Q.  Do you have them in your possession?

Page 36

CONFIDENTIAL

1          A.   I sent it to ABFF and TV One.

2          Q.   Did you send it to ABFF or just to the TV One

3     online portal for submission?

4          A.   Yeah, TV One through ABFF, yes.

5          Q.   Okay.  So just to be clear, you never sent the

6     screenplay directly to ABFF to the best of your

7     knowledge?

8          A.   Yeah, I think it was on the ABFF website.  You

9     go to ABFF's website and maybe it links you to as I

10    believe it the way to, you know, link with TV One.

11         Q.   Okay.  So there may have been a link to the

12    competition entry portal on ABFF's website at the

13    time?

14         A.   Yeah.  I think.  I think that's how it worked.

15         Q.   So do you know -- you said something about Mr.

16    Hardwick being a judge in similar competitions and

17    being on panels.  Do you know whether Mr. Hardwick was

18    a judge of the 2017 competition?

19         A.   Well, that's what I believe based on what he

20    had done in the past.

21         Q.   Had he ever been a judge in any TV One

22    screenplay competition in the past?

23         A.   In the past I know he's worked with TV1.  I

24    cannot speak to what he's judged previous to 2017.

25         Q.   So, you don't know for sure that Mr. Hardwick

                                        Page 38

CONFIDENTIAL

1    was a judge of the 2017 competition, do you?

2         A.   I believe he was.

3         Q.   And that belief is based just on the fact that

4    Mr. Hardwick had done things for TV One in the past?

5         A.   And that he's done this in a number of

6    capacities.   He's done this exact thing.   We're

7    talking about submitting a screenplay and then having

8    it judged.   He has done that in a number of

9    capacities.

10        Q.   Can you explain that a little bit more?   What

11   has he done in a number of capacities?

12             MS. ROSSMAN:   Objection, asked and

13   answered.   Mr. Shaw's already explained his

14   understanding of Mr. Hardwick's previous role as a

15   judge in previous competitions.

16             MR. FREED:   I am not understanding the

17   testimony though, so we have to follow up.

18             THE WITNESS:   What's the question?

19        Q.   (By Mr. Freed) Let me just reask it.

20             What had Mr. Hardwick done in the past

21   that leads you to conclude that he was a judge of the

22   2017 competition?

23        A.   He has judged other screenplay competitions.

24        Q.   Okay.   So you are assuming, correct, that he

25   was a judge of the 2017 competition based only on the

Page 39

CONFIDENTIAL

1    fact that he has judged other competitions in the

2    past.  Is that true?

3         A.  Directly similar to this one, yes.

4         Q.  But yes, is the answer yes?

5         A.  Yes.  Based on also his -- based on also his

6    over a decade relationship working closely with TV One

7    and ABFF.

8         Q.  So you don't know one way or the other whether

9    Mr. Hardwick was a judge for the 2017 competition, do

10   you?

11             MS. ROSSMAN:  Objection, argumentative.

12        Q.  (By Mr. Freed) You can answer.

13        A.  My belief is based on what he's done in the

14   past.

15        Q.  Can you answer the question though?  You don't

16   know one way or the other whether Mr. Hardwick was a

17   judge of the 2017 competition, do you?

18        A.  They didn't release the panelists' and the

19   judges' names when I submitted.

20        Q.  So do you know who any of the judges were for

21   the 2017 competition?

22             MS. ROSSMAN:  Objection, asked and

23   answered, argumentative.

24             MR. FREED:  I haven't asked that question

25   yet.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

```
 1      judge.
 2          Q.  Let's move on.
 3              MS. ROSSMAN:  Jake, would now be a good
 4      time for a bathroom break?
 5              MR. FREED:  Sure.
 6              MS. ROSSMAN:  Five minutes.
 7              MR. FREED:  Let's take five.  I will be
 8      back in five.  If you need a little longer, that's
 9      fine.
10              MS. ROSSMAN:  Okay.
11              MR. FREED:  Off the record.
12          (A recess was here had 2:07 to 2:18.)
13          Q.  (By Mr. Freed) Mr. Shaw, welcome back.  Let's
14      just finish up what we were talking about before the
15      break.
16          A.  Sure.
17          Q.  Did anybody ever tell you that Omari Hardwick
18      served as a judge in the 2017 competition?
19          A.  Did anybody ever tell me Omari Hardwick served
20      as a judge in the competition?  No.
21          Q.  Have you ever communicated with anybody that
22      you understood to have been a judge at the 2017
23      competition?
24          A.  I think you already asked that, but no.  Once
25      I clicked the link I was not contacted by anybody from
```

Page 44

CONFIDENTIAL

1   transmitted through someone what you just asked, that

2   is possible.  I submitted it so they had it.  You see

3   what I'm saying?

4        Q.  Okay.  Then let me ask it this way.  Do you

5   have any information in your possession, do you have

6   any knowledge -- strike that.

7             Do you have any knowledge that somebody

8   affiliated with TV One transmitted any information

9   about your screenplay to any Defendant in this case?

10        A.  Direct knowledge, no, I don't.

11        Q.  Any indirect knowledge?  Anything you've

12   heard?

13        A.  Well, that my movie got made, that's the

14   indirect knowledge, the film I submitted got produced

15   and released.  So that's the indirect knowledge.

16        Q.  Okay.  So same question as to ABFF, do you

17   have knowledge that anybody affiliated with ABFF ever

18   transmitted any information about your screenplay to

19   any Defendant in this case?

20        A.  Kind of along the same lines as TV One.

21        Q.  Okay.  So same answer you just gave as to TV

22   One?

23        A.  Yes.  There are a number of different ways

24   that Nate Parker could have acquired the screenplay.

25        Q.  And can you explain those different ways to

Page 46

```
1    me?
2         A.  It would be speculative, it would be
3    speculative, so I'd rather not.  But, again, it was
4    produced, so --
5         Q.  Do you know whether ABFF itself ever came into
6    possession of your screenplay?
7         A.  I don't know how that necessarily works.  I
8    mean, it's in partnership with.  I mean, I could not,
9    you know -- the path once you send it I don't know,
10   you know, TV One, ABFF, I just submitted it.
11        Q.  I understand.
12             Okay.  So besides submitting your
13   screenplay to the 2017 competition, did you ever give
14   your screenplay to anybody else prior to 2020?
15        A.  Like my wife, my brother, like that type of
16   thing.
17        Q.  Yeah.  So, I mean, what I want to get at is,
18   you know, if you believe there was any way that
19   Defendants could have gotten your screenplay.  I'll
20   just ask it.  Do you believe there's any channel
21   through which Defendants could have gotten your
22   screenplay other than the 2017 competition?
23        A.  No.
24        Q.  So you don't believe that your wife gave the
25   screenplay to any Defendant in this case?
```

Page 47

```
 1          A.  I hope not.
 2          Q.  I hope not too, but yeah, you know, I got to
 3     ask it.
 4               Same for your brother, do you have any
 5     reason to think that your brother gave any Defendant
 6     access to this screenplay?
 7          A.  No.
 8          Q.  Is there anybody else sitting here today that
 9     you can recall giving the screenplay to prior to 2020?
10          A.  No.
11          Q.  Okay.  So, let's mark Exhibit 6.  And that's
12     going to be the Complaint in the case.
13               (Defendant's Exhibit Number 6 marked for
14               identification purposes and made part of the
15               record.)
16          Q.  (By Mr. Freed) Just take a couple minutes and
17     look it over and in particular I'm going to ask you
18     some questions about Paragraphs 75 through 81.  So if
19     you could just take a minute and read those and then
20     let me know when you're ready and I'll ask you a few
21     questions.
22          A.  Okay.
23               (A brief pause.)
24               Yeah, I'm ready.
25          Q.  Okay.  Mr. Shaw, have you seen this document
```

Page 48

CONFIDENTIAL

```
 1            A.  Yes, I believe so.
 2            Q.  And that's what we talked about earlier.
 3       Well, strike that.
 4                 Sitting here today do you have any reason
 5       to believe any of the four corporate Defendants,
 6       that's Tiny Giant, Vertical, ASP and TM Film Finance,
 7       do you believe any of those four Defendants obtained
 8       access to your screenplay?
 9            A.  Say that again.
10            Q.  Do you believe -- so there are five Defendants
11       in this case.  One is Mr. Parker who we've talked
12       about and then there are four corporate entities.
13            A.  Yeah, those are the distributors, I believe,
14       of the film.
15            Q.  Distributors, the financiers, the producers.
16            A.  Correct.
17            Q.  Do you believe those four corporate Defendants
18       had access to your screenplay?
19            A.  Well, directly, no, indirectly, yes.
20            Q.  When you say indirectly, what do you mean?
21            A.  Through Mr. Parker, their work with Mr.
22       Parker.  They were on, you know, a part of the
23       project.  So did they hold it in their physical hands,
24       no.  But, I mean, are they a part of it, yes, because
25       through Mr. Parker they had access.
```

Page 50

1   Q.   So you believe if they had access Mr. Parker

2   was the conduit through which they obtained it?

3   A.   Yes.

4        Q.   And you're not contending that they directly

5   received your screenplay through some other means

6   other than Mr. Parker?

7        A.   That's not what I just said.  I mean, they

8   were indirectly, they weren't involved in terms of

9   through Mr. Parker.  I never submitted anything to

10  those entities.  So you know what I'm saying?  And

11  there was no -- you know, they weren't hosting

12  anything.

13       Q.   Okay, let's look at Paragraph 77.  I'll just

14  read it for the record.  It says, TV One is an

15  established television network focusing on programming

16  and content aimed at predominantly African American

17  audience.  The 2017 TV One screenplay competition was

18  administered and judged in partnership with the

19  American Black Film Festival, ABFF.  The competition

20  is judged by a team of industry professionals.  As

21  part of the screenplay competition TV One had actors

22  play out scenes from several entries.

23            Do you see that there?

24       A.   Yes.

25       Q.   Okay.  How do you know that the competition

Page 51

CONFIDENTIAL

```
 1        was judged by a team of industry professionals?
 2             A.  It says it right there.
 3             Q.  I mean, it says it there because it must have
 4        come from somewhere else.  So what I'm wondering is
 5        why is that statement here and how you know that, in
 6        fact, the TV One competition was judged by a team of
 7        industry professionals.
 8             A.  Because they said it.  I'm only going off what
 9        they said.  They said submit, I submitted, they
10        said -- they set the guidelines, so that's what they
11        said.  That's not -- you see what I'm saying?
12             Q.  Yeah, yeah.  Yeah, I get it.  So that is
13        something that TV One -- you understood that TV One
14        had represented to the public.  Is that correct?
15             A.  Yes.  That's what they said to the public,
16        yes.
17             Q.  Okay.  And how about this part, the last line,
18        that TV One had actors play out scenes from several
19        entries?  How do you know that TV One had actors play
20        out scenes from several entries?
21             A.  Because at ABFF they played out the scenes.
22             Q.  How do you know that?
23             A.  They're available online.  At the part of
24        the -- part of the festival is, you know, them reading
25        scenes.  So in the film making process this is done a
```

                                              Page 52

CONFIDENTIAL

1    lot, but in this case they just did it live as part of

2    the festival.

3        Q.   Okay.

4        A.   That information is widely available online.

5    I don't think they were making up anything about how

6    the competition was, you know, played out in terms of

7    it being judged by professionals or being acted out.

8        Q.   Okay.  So let's fast forward then to Paragraph

9    80.  And that reads for the record, Mr. Hardwick, in

10   fact, was one of the actors who played out scenes from

11   entries in the 2017 TV One screenplay competition.

12            Do you see that allegation there?

13       A.   Yes.

14       Q.   How do you know that Mr. Hardwick, Omari

15   Hardwick played out scenes from entries in the 2017

16   competition?

17       A.   Well, at the time that I submitted this I

18   believe that he was one of the actors who played out

19   scenes because he had done that in the past.

20       Q.   So, do you have any information, any knowledge

21   that Mr. Hardwick, in fact, played out scenes at the

22   2017 competition?

23       A.   No, I have not seen any footage of him playing

24   out scenes.

25       Q.   Have you ever read anything that listed him as

Page 53

CONFIDENTIAL

```
 1        Q.   (By Mr. Freed) You can answer, Mr. Shaw.
 2        A.   Can you -- you're saying -- I'm sorry, you're
 3   saying do I know -- repeat the question, please,
 4   because it's getting a little confusing.  I'm sorry.
 5        Q.   A straightforward question.  The question
 6   is --
 7        A.   Okay.
 8        Q.   -- do you have knowledge that anybody, known
 9   or unknown, transmitted your screenplay to any
10   Defendant in this case?
11        A.   Yes, I have knowledge because I saw my film
12   get made.  If you're asking me my knowledge, my
13   knowledge is the film got produced.  If you're asking
14   for a name, I've been clear on that, but the knowledge
15   is it got produced.  So if you're saying knowledge,
16   that's the knowledge, I submitted the film, the film
17   gets produced, so that's my knowledge.  You're saying
18   give me a name.  I'm telling you I don't have a
19   specific name from a specific entity outside of the
20   names we discussed.
21        Q.   Okay.  So, is it correct to say then you are
22   assuming that a named Defendant got access to your
23   film because American Skin is similar to A Routine
24   Stop?  Is that your testimony?
25        A.   Repeat that, please.
```

Page 67

CONFIDENTIAL

1    Defendants had access to the screenplay for A Routine

2    Stop in a number of ways through either TV One or

3    ABFF?

4        A.  Sorry, can you say that again, please?

5        Q.  Yeah.  So you sort of said two things here.

6    One is that Omari Hardwick has close connections with

7    ABFF, and two, he was a judge at the TV One

8    competition.  Is that a fair statement of what the

9    answer is?

10       A.  Yes.

11       Q.  And what I'm asking is, sitting here today do

12   you have -- are there any other facts that you know

13   showing that Defendants had access to your screenplay

14   through either TV One or ABFF, anything you'd want to

15   add to this response?

16       A.  I don't think so.

17       Q.  Okay.  So, let's go to the next page,

18   Interrogatory Number 2.  And that says, state all

19   facts supporting your allegation that Omari Hardwick

20   had access to your screenplay.

21            Do you see that?

22       A.  Yes.

23       Q.  And the response, you have your objections and

24   then the response at the bottom paragraph is the same,

25   you cite two things, one, Omari Hardwick's, close,

Page 80

CONFIDENTIAL

```
 1        to Defendants in this case?

 2            A.   I don't believe so, no.

 3            Q.   Okay.  And did you ever have any oral

 4        communications either in person or telephonically or

 5        on video with anyone affiliated with ABFF regarding

 6        your screenplay?

 7            A.   No.

 8            Q.   Okay.  So Interrogatory Number 6 asks you,

 9        this is on Page 10, it asks you to identify each and

10        every instance in which you provided your screenplay

11        or any version of your screenplay to any person prior

12        to the 2019 premier of American Skin.

13                 Do you see that?

14            A.   Yes.

15            Q.   And if you go down to the answer at the bottom

16        of that section on Page 11 it says, Plaintiffs respond

17        to this interrogatory by stating they submitted their

18        screenplay to the TV One competition prior to the 2019

19        premier of American Skin.

20                 Do you see that?

21            A.   Yes.

22            Q.   I think we talked about this earlier but I

23        just want to be sure, is it your testimony that you --

24        that between 2017 and the premier of American Skin

25        that the only people or entities you submitted your
```

Page 84

CONFIDENTIAL

1     screenplay to were the 2017 competition, your brother

2     Langston, your wife.   Is that all?

3          A.   Yes, I believe so.

4          Q.   Okay.   Then the last interrogatory asks, this

5     is on Page 11, Interrogatory 7, state all festivals or

6     competitions that you submitted your screenplay to

7     including the names and years of those festivals or

8     competitions.

9                Do you see that?

10         A.   Yes.

11         Q.   Okay.   And then the answer is, subject to your

12    objections, Plaintiffs respond to this interrogatory

13    by stating they submitted their screenplay to the TV

14    One competition prior to the 2019 premier of American

15    Skin.

16               Do you see that?   That's on Page 12.

17         A.   Yes.

18         Q.   Okay.   So, just want to confirm.   You never

19    submitted the screenplay to any other festivals or

20    competitions besides the 2017 competition.   Is that

21    correct?

22         A.   I don't believe so, no.

23         Q.   Okay.   Okay, you can set that one aside.

24               I want to talk a little bit -- and we're

25    almost done here you'll be glad to know.   We'll finish

Page 85

CONFIDENTIAL

1                C E R T I F I C A T E

2

     STATE OF OKLAHOMA   )

3                        )  SS:

     COUNTY OF OKLAHOMA  )

4

5              I, David Buck, Certified Shorthand Reporter

6     within and for the State of Oklahoma, do hereby

7     certify that SELTON HAITH SHAW was by me first duly

8     sworn to testify the truth, the whole truth and

9     nothing but the truth, in the case aforesaid; that the

10    above and foregoing deposition was taken in shorthand

11    and thereafter transcribed; that the same was taken on

12    September 27th, 2024, in Washington, DC, Oklahoma;

13    that I am not an attorney for nor a relative of any

14    said parties, or otherwise interested in said action.

15              IN WITNESS WHEREOF, I have hereunto set my

16    hand and official seal this 9th day of October, 2024.

17

18

19

20

21                    <%8249,Signature%>

22                         David Buck, CSR #1585

23

24

25

                                          Page 99